## THE UNITED STATES, PLAINTIFFS, v. JAMES L. DAWSON, AND JOHN R. BAYLOR.

In June, 1844, Congress passed an act, by virtue of which the Circuit Court of the United States for the District of Arkansas, was vested with power to try offences committed within the Indian country.

In July, 1844, it was alleged that a murder was committed in that country.

In April, 1845, an indictment was found by a grand jury, in the Circuit Court of the United States for the District of Arkansas, against a person charged with committing the murder.

In March, 1851, Congress passed an act erecting nine of the Western counties and the Indian country into a new judicial district, directing the judge to hold two . terms there, and giving him jurisdiction of all causes, civil or criminal, except appeals and writs of error, which are cognizable before a Circuit Court of the United States.

The residue of the State remained a judicial district to be styled the Eastern District of Arkansas.

This act of Congress did not take away the power and jurisdiction of the Circuit Court of the United States for the Eastern District to try the indictment pending.

THIS case came up from the Circuit Court of the United States for the Eastern District of Arkansas, upon a certificate of division in opinion between the judges thereof.

The two following questions were certified, viz.

1st. Did the act of Congress, entitled "An act to divide the district of Arkansas into two judicial districts," approved the third day of March, in the year of our Lord one thousand eight hundred and fifty-one, whereby the Western District of Arkansas was created and defined, take away the power and jurisdiction of the Circuit Court of the United States for the Eastern District of Arkansas, so that it cannot proceed to hear, try, and determine a prosecution for murder, pending against the prisoner, James L. Dawson, a white man and not an Indian, upon an indictment found, presented, and returned into the Circuit Court of the United States for the District of Arkansas, by the grand jury impanelled for that district, upon the 16th day of April, in the year of our Lord one thousand eight hundred and forty-five, against said James L. Dawson, a white man, for the felonious killing of Seaborn Hill, another white man and not an Indian, on the eighth day of July, A. D. 1844, in that country belonging to the Creek nation of Indians, west of Arkansas, and which formed a part of the Indian country annexed to the judicial district of Arkansas by the act of Congress approved the seventeenth day of June, A. D. 1844, entitled "An act supplementary to the act entitled 'An act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers, passed thirtieth June, one thousand eight hundred and thirty-four,'" in which cause, so pending, no trial has as yet been had.

2d. Can the District Court of the United States for the Western District of Arkansas take jurisdiction of the case aforesaid, upon the indictment aforesaid, so found in the year 1845, in said Circuit Court for the District of Arkansas?

Although the name of Dawson only was mentioned in the question certified, yet the record showed that Baylor was indicted at the same as aiding and abetting in the murder.

A motion was made in the Circuit Court to quash the indictment upon the ground that this honorable court has no jurisdiction or power to hear, try, or determine this case and prosecution, and that all its jurisdiction and power in that behalf ceased and was extinguished on the third day of March, 1851, when that part of the Indian country, in which the offence is charged to have been committed, was severed from this district, and made part of a new district, under the jurisdiction of the District Court of the United States, for the Western District of Arkansas."

It was upon this motion that the judges differed in opinion and certified the two questions, above stated, to this court.

The motion to dismiss the case was argued by *Mr. Lawrence* and *Mr. Pike,* for Dawson, and by *Mr. Cushing,* (Attorney-General,) for the United States.

*Mr. Pike*, in his brief, made the following argumentative statement of preëxisting laws upon the subject.

This is an indictment againt James L. Dawson for a murder alleged to have been committed at the Creek agency, in the Creek country, west of Arkansas, on the 8th day of July, A. D. 1844. The bill was found by the grand jury for the Arkansas district, at the April term, 1845, of the Circuit Court of the United States for the District of Arkansas.

At the April term, 1853, present Mr. Justice Daniel, and the honorable Daniel Ringo, district judge, a motion was made to quash the indictment for want of jurisdiction, on which motion the judges dividing in opinion, the prisoner was admitted to bail in an amount which he has been wholly unable to give; and upon a certificate of division of opinion the case has come into this court.

By the act of March 3d, 1817, (3 Stat. at Large, 383,) jurisdiction and power of trial, in cases where offences were committed in any town, district, or territory belonging to any nation or tribe of Indians, were given to the courts of the United States "in each territory and district of the United States in which any offender against this act shall be first apprehended or brought for trial."

The Constitution, art. III, sect. 2, No. 3, had provided that "the trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the State where the said crime shall have been committed; but when not committed within any State, the trial shall be at such place or places as the Congress may by law have directed."

The States and people not thinking this a sufficient guaranty for a fair and impartial trial, art. VI. of the amendments to the Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law."

The Intercourse Act of 30th June, 1834, (4 Stat. at Large, 733,) by the 24th section, after making divers provisions, defining the limits of the "Indian country," and imposing penalties for sundry offences, provides "that, for the sole purpose of carrying this act into effect," certain Indian country, bounded east by Arkansas and Missouri, west by Mexico, north by the Osage country, and south by Red River, "shall be, and hereby is annexed to the territory of Arkansas;" and by section 25 it was provided "that so much of the laws of the United States as provides for the punishment of crimes committed within any place within the sole and exclusive jurisdiction of the United

States shall be in force in the Indian country; provided the same shall not extend to crimes committed by one Indian against the person or property of another Indian." Power to apprehend offenders in the Indian country, and take them into " the judicial district having jurisdiction," was given by sec. 26.

Under this act the Superior Court of the Arkansas Territory took and exercised jurisdiction as to offences committed in the Indian territory so annexed to Arkansas.

But, by act of June 15th, 1836, (5 Stat. at Large, 50, 51,) Arkansas was admitted as a State; and sec. 4 provided " that the said State shall be one judicial district, and be called the Arkansas District, and a District Court shall be held therein, to consist of one judge, who shall reside in the said district, and be called a district judge." It was provided that he should hold semiannual sessions at Little Rock, and that he should " in all things have and exercise the same jurisdiction and powers which were by law given to the judge of the Kentucky district, under an act entitled An act to establish the udicial courts of the United States."

That was the act of September 24th, 1789, (1 Stat. at Large, 73.) That act gave to the District Court of Kentucky the jurisdiction of a circuit court, except on appeals and writs of error, in addition to the ordinary district-court jurisdiction. Sec. 10, and sec. 29, provided that in cases punishable with death, the trial should be had in the county where the offence was committed; or, where that could not be done without great inconvenience, twelve petit jurors at least should be summoned from thence.

There was, in the act of 1836, no express repeal of so much of the act of 1834 as applied to Arkansas; but the legislature, by expressly limiting and defining the bounds of the Arkansas district, and making it to be composed of the State, cut away the Indian country, and severed its connection with Arkansas. It was therefore held by the District Court of Arkansas that it formed no part of the district, and that the court had no jurisdiction to try and determine cases upon indictments found in the Superior Territorial Court, for offences committed in the Indian country prior to the 15th June, 1836; and all prisoners so indicted were discharged.

To remedy this, by act of March 1, 1837, (5 Stat. at Large, 147,) it was provided, that the District Court of Arkansas should have " the same jurisdiction and power in all respects whatever that was given to the several district courts," by the intercourse act of March 30, 1802, " or by any subsequent acts of Congress, concerning crimes, offences, or misdemeanors, which may be committed against the laws of the United States in any town, set-

tlement, or territory, belonging to any Indian tribe in amity with the United States, of which any other district court of the United States may have jurisdiction."

Section 15 of this act of 1802, like the act of 1834, gave the jurisdiction of offences committed against its provisions to the territorial, circuit, and other courts of the United States, in each district in which the offenders should be apprehended, or into which, agreeably to the provisions of the act, they should be brought for trial. By sec. 19, persons apprehended in the Indian country were to be taken into one of the three adjoining States or districts for trial. If apprehended in any district, they were, by sec. 17, to be tried there.

By act of March 3, 1837, (5 Stat. at Large, 176,) the districts of Alabama, Mississippi, and Arkansas, and the Eastern District of Louisiana, were erected into the ninth circuit; and provision being made for holding a circuit court at Little Rock, it was further, by the third section, provided, that so much of any act or acts of Congress as vested in sundry district courts, including that of Arkansas, " the power and jurisdiction of circuit courts," should be, and was thereby repealed, and like jurisdiction was given to the Circuit Court of Arkansas as to other circuit courts, and to the District Court of Arkansas as to other district courts.

Under these acts it was held by the Circuit Court for the District of Arkansas, in 1842, I think, present Mr. Justice Daniel and the honorable Benjamin Johnson, district judge — that the court had no jurisdiction as to offences committed in the Indian country.

By act of August 23, 1842, (5 Stat. at Large, 517,) concurrent jurisdiction with the Circuit Court was given to the district courts in prosecutions for offences not capital.

And by act of June 17, 1844, (a few days before the day on which the offence in this case is charged in the indictment to have been committed,) 5 Stat. at Large, 680, the courts of the United States in and for the district of Arkansas were vested with the same power and jurisdiction, to hear, try, determine, and punish, all crimes committed within the Indian country designated in the 24th section of the intercourse act of June 30, 1834, and therein and thereby annexed to the territory of Arkansas, as were vested in the courts of the United States for that territory before it became a State; and the act went on to declare : " That for the sole purpose of carrying this act into effect, all that Indian territory heretofore annexed by the said 24th section of the act aforesaid to the territory of Arkansas, be, and the same hereby is annexed to the State of Arkansas."

Under this act, the Circuit Court assumed jurisdiction of

offences committed in the Indian country; and, among other indictments, this was found.

But on the 3d of March, 1851, a new act passed, (9 Stat. at Large, 594,) by which it was enacted — Sec. 1. That from and after the passage of this act, the counties of Benton, Washington, Crawford, Scott, Polk, Franklin, Johnson, Madison, and Carroll, and all that part of the Indian country lying within the present judicial district of Arkansas, shall constitute a new judicial district, to be styled ' The Western District of Arkansas;' and the residue of said State shall be and remain a judicial district, to be styled ' The Eastern District of Arkansas.' "

By sec. 2 of this singularly worded act, " the judge of the District-Court of Arkansas " is directed to hold two terms " of said court " in each year; at Van Buren, in Crawford county, and special and adjourned sessions when needed.

By sec. 3 it is provided, that " the District Court of the United States for the Western District of Arkansas, hereby established," shall have, besides district-court jurisdiction, " within the limits of its respective district," circuit-court jurisdiction, except in cases of appeals and writs of error, and proceed like a circuit court, with right of appeal to the Supreme Court.

By sec. 4 a marshal and district-attorney " for said Western District of Arkansas," were provided for, and the district judge was empowered to appoint a clerk " of said court hereby established."

Since the passage of this act, and the establishment of the District Court for the Western District of Arkansas, that court has taken jurisdiction of indictments found there for capital offences committed in the Indian country prior to the passage of the act, and has tried, convicted, and sentenced the parties, and had them executed.

And at the same time a Circuit Court for the Eastern District of Arkansas has been opened and held, succeeding to the business of the Circuit Court for the District of Arkansas, and the cases pending there when the act passed had been proceeded in as still in the same court. Persons have been tried for offences committed in the Indian country, and upon indictments found in the Circuit Court for the District of Arkansas, prior to the passage of the act of 1851; and one, convicted of manslaughter, is still imprisoned under the sentence. But in the case of Dawson, the question of jurisdiction was formally raised, and comes up here for consideration.

At common law, in criminal cases, the venue was local, and matter of substance affecting the jurisdiction and power of the grand jury, who were to find the indictment or make the presentment, as well as of the court who were to try the cause and carry into effect the law. 1 Chitty, Cr. Law, 177, 190.

(After examining the English authorities upon this point, the counsel proceeded to the American.)

One of the grounds of complaint, set forth in the Declaration of Independence against the English king, was "for transport-ing us beyond seas to be tried for pretended offences."

After the Constitution was framed, it did not seem to the States and people that the rights of the citizen were sufficiently guarded by the provision which gave Congress, where an offence was not committed within any State, the power to direct, as well after as before the offence was committed, at what place the trial should be had. The objections to this were obvious. In every case where an offence was committed beyond the limits of a State, as on the high seas or in a territory, Congress might virtually decide the case against the accused by directing that he should be tried in a remote or unfriendly district. If the offence were a political one, especially, this was a power dan-gerous and odious in the extreme. The sixth article of the amendments wisely took away this whole power, and provided that the trial of all criminal prosecutions should be by an im-partial jury of the State and district wherein the crime should have been committed, and required that such district should have been previously ascertained by law. It is obvious that the phrase means, previously to the commission of the offence, be-cause, if Congress could create or ascertain the district after its commission, that was continuing their power to direct the trial to be had at whatever place they might think most apt and fit for the particular case.

It will occur to every one, that it would be intolerable if a power existed by which, if a man committed an offence in Oregon or Florida, Congress might, in order to strike him down with perfect certainty, attach the particular place where he com-mitted the offence to the District of Maine, so as to carry him to Portland for trial; retaining, of course, the power to sever again from the district the country so attached, so soon as the political or other offender should be immolated, and the ends of public or party vengeance attained.

And it will also occur, that it would be equally dangerous to concede to Congress a power, when an offence has been com-mitted, to sever the particular place at which it was committed from the district of which it then formed a part, and so, disen-abling the court to send beyond its district for jurors, utterly deprive the accused of the right to a jury of the vicinage.

It was not intended by the amendment to leave the rights of the accused to be settled by the caprice or hostility of Congress, and by laws enacted on the spur of the moment, to suit the

40 *

particular occasion, reach the particular case, and strike the particular individual.

The amendment is, therefore, peremptory. No man can be tried, under any circumstances, elsewhere than in the State or district where he committed the offence. Nor can new districts be created, *ad libitum*, after the offence is committed, to carry the trial to whatever remote point Congress may please, for reasons of prejudice, ill will, or favoritism, in order to acquit or convict, as inward feeling or outward pressure may dictate, giving to the particular party, at the option of Congress, friendly or unfriendly juries and judges, and allowing or taking from him a jury of his vicinage. Such a power, in a free country, would be intolerable. Congress could acquit or condemn at its pleasure. The district within which the crime was committed must have been previously ascertained by law. Thus, and thus only, will a possibility of special legislation for the particular case be avoided, and this power of attainder in disguise taken away.

There have never been but two districts in which it could be said that the offence in this case was committed. The Eastern District of Arkansas is limited to certain specified counties of the State; and it is not the district within which the offence was committed. It was committed in the former District of Arkansas, and in what now forms a part of the Western District of Arkansas. If Dawson is now tried in the Eastern District, certainly he is not tried in the district within which he committed the offence.

The notion upon which the claim to jurisdiction appears to rest is, that the Circuit Court for the Eastern District is either the same court as the former Circuit Court for Arkansas, or its successor. But so is the District Court for the Western District its successor; for the judge of the District Court of Arkansas is to hold two terms of said court at Van Buren.

This idea does not even sound the question, to see how deep it is. To create a circuit or district court, and confer upon it all power to punish crimes within the power of Congress to bestow, would be wholly unavailing, until the territory was defined within whose limits its jurisdiction should operate. No jurisdiction whatever could be exercised until a district was established and defined. The continued existence of the court avails nothing, if its jurisdiction is compressed into narrower territorial limits. Its power shrinks within these limits at once. If the particular place in which the offence was committed is, after the commission of the offence, severed from the district, or left outside of the jurisdiction by the process of compression, and the offence is still tried in the court whose jurisdiction is so

narrowed, the offence, we may admit, would be tried in the same court as if it had been tried there before the excision of territory; but the fact still remains, that it will not be tried in the district, previously ascertained by law, in which the offence was committed.

It is said that it is the district in which the offence was committed. That is not so, because it is a new and different district altogether; the district in which the offence was committed no longer exists, but two new districts exist in lieu of it. It might as well be said that, if you sever a man in the middle, he still exists. Suppose, however, that the act had merely taken off from the Arkansas District the Indian country, and left the former district to stand with its old name, still the Arkansas District, as it was before—*totus teres atque rotundus*—still, although the Arkansas District, it would not be the district in which the offence was committed. If you cut off a man's hand, the man remains, identical and one, as before; because the man, the individual, the *me*, is something different and distinct from each of his members. You may even imagine that a particular faculty or part of the soul could be cut away, and yet the residue would continue the identical individual which existed before.

But if you cut a tract of land or country in two, you may call one half by the name previously borne by the whole, and for some purposes it may be the same tract or country; but for others it is not so. Take from Arkansas a county, or half a dozen counties, and in many senses the residue would be the same Arkansas that existed before. Suits in her favor would not abate, nor her contracts be annulled, because the sovereignty or municipal corporation which constitutes the State does not lose its individuality by parting with a portion of its territory.

But the word district does not mean a corporation, or a being, but a mere tract and extent of country; and, when it is divided, one half of it is no more the same district that existed before than the other is. A half is not the whole; nor can two halves continue to be each the previous whole.

This may be made more plain, and the fallacy of the notion more striking, by reflecting that it operates both ways; and, if the district remains the same when part of its territory is cut away, so it would if a vast extent of new territory was added. Suppose Congress had chosen to annex the Indian country to the District of Columbia, the argument would be thus: The crime was committed at the Creek agency; that is now made part of the District of Columbia by annexation. The District of Columbia is a corporation, one and identical, the same now as before; consequently, it is the District of Columbia in which

the offence was committed. On the other hand, it could be said the offence was committed in the District of Arkansas; the place where it was committed no longer forms part of that district; but the fact still remains, that the crime was committed in the District of Arkansas.

All the reason of the thing would be in favor of the District of Columbia; because the *locus* of the offence now forming part of that district, the accused might have a jury of the vicinage; while, if tried in the maimed District of Arkansas, he could not.

The truth is, that the continued existence and identity of the metaphysical *ens*, called district, territory, state, or of that other called the court, has nothing to do with the question. If it has, the right guaranteed amounts to nothing. The trial is to be in the district where the offence was committed, in order that the party may have, if not the reality, at least the possibility or fiction of a right to a jury of the vicinage. A constitutional provision, without a reason for it, would be a monster. The right is one that continues to the trial; it is, indeed, a right of the trial. The right is, that the identical place, and fixed solid ground, or unstable water, where the offence was committed, shall then be within the district in which the party is to be tried. If there is any district in which this person could now be tried, it is the Western District of Arkansas. The only way to avoid the difficulty would have been, as the cases we have cited show, for Congress to have declared the old district to continue, with its original territorial extent, for all the purposes of this and similar cases.

The courts of the United States have no jurisdiction, as to crimes, except such as is expressly conferred by statute. In such cases, they have no implied powers, nor any derived from the common law. Hudson v. Goodwin, 7 Cranch, 32.; United States v. Worrall, 2 Dallas, 384; United States v. Coolidge, 1 Wheat. 415; 1 Kent, 337-8-9; United States v. Bevans, 3 Wheat. 336.

And it is equally indispensable that the law should put the place where the crime occurs within the jurisdiction of the court which is to try the case. United States v. McGill, 4 Dall. 426; United States v. Bevans, 3 Wheat. 336; Ex parte Bollman and Swartwout, 4 Cranch, 75, 131; United States v. Wiltberger, 5 Wheat. 76.

It is a well-settled principle, that where a statute creating an offence is repealed, and no provision is made for carrying forward prosecutions commenced under it, all such prosecutions are absolutely ended with the repeal of the law.

Such was decided to be the effect of the act repealing the

bankrupt act of 1803, in United States *v.* Passmore, 4 Dall.
372.

And the same decision was made in Miller's case, 1 W. Bla.
451. No proceedings are pursuable under a repealed statute,
which commenced before the repeal.

These decisions, and others to which we shall refer, do not
proceed upon any peculiar principle especially applying to pe-
nalties imposed by repealed acts, or to the destruction of the
criminal character of acts done before the repeal, but upon a
broad general principle of universal application.

And that principle is simply that stated by Lord Tenterden,
in Surtees *v.* Ellison, 9 Barn. & Cresw. 752, where he said :
" It has been long established that, when an act of parliament
is repealed, it must be considered, except as to transactions
passed and closed, as if it had never existed. That is the gene-
ral rule ; and we must not destroy that by indulging in conjec-
tures as to the intention of the legislature. We are therefore
to look at the statute, 6 Geo. 4, ch. 16, as if it were the first that
had ever been passed on the subject of bankruptcy." His lord-
ship felt the pressure of the consequences of the decision, but
the law was too well settled to be disregarded ; and he added :
" It is certainly very unfortunate, that a statute of so much im-
portance should have been framed with so little attention to the
consequences of some of its provisions. It is said that the last
will of a party is to be favorably construed, because the testator
is *inops consilii.* That we cannot say of the legislature ; but
we may say that it is ' *magnas inter opes inops.* ' " See also
Dwarris on Statutes, 673, 676.

The counsel then proceeded to examine other analogous prin-
ciples, which there is not room to insert.


*Mr. Cushing,* (Attorney-General,) insisted that the act of 3d
March, 1851, has not taken away the jurisdiction of the Circuit
Court to hear and determine the said indictment then found
and pending.

The said act of 3d March, 1851, did not create a new Circuit
Court. It created a new District Court, having the ordinary
powers of the District Court of the United States within the
territory assigned to it, with an anomalous increase of jurisdic-
tion ; but it left the then existing Circuit Court unrepealed, in
being and activity.

The general powers of the then existing Circuit Court, re-
mained unimpaired as to cases begun and pending ; its future
jurisdiction was limited to cases originating within a smaller
territorial district. The territory within which the Circuit
Court then existing should exercise its powers over new suits

and prosecutions thereafter to be instituted, was lessened; but the powers which belonged to it as a circuit court, and as common to all the other Circuit Courts of the United States, were not diminished.

The general rule is, that where the jurisdiction of a court over the subject-matter has once vested, it is not divested by a subsequent change of circumstance. United States v. Myers, 2 Brock. 516; Morgan v. Morgan, 2 Wheat. 290; Mollan v. Torrance, 9 Wheat. 537; Clarke v. Matthewson, 12 Peters, 165.

Thus, where the complainants, being citizens of a State other than Kentucky, sued citizens of the State of Kentucky in the Circuit Court of the United States for the Kentucky District, and pending the suit one of the complainants voluntarily removed to, and became a citizen of, the State of Kentucky, the Supreme Court of the United States decided unanimously " that the jurisdiction of the court having once vested, was not divested by the change of residence of either of the parties." Morgan's heirs v. Morgan, 2 Wheat. 293, 297.

There are no words in the act of 1851 to give it a retrospective effect, to make it retroact upon pending suits and prosecutions, rightfully commenced in the preëxisting and continuing Circuit Court. To give, by implication, a retrospective effect to the newly-created District Court, whereby to divest a preëxisting and continuing superior Circuit Court of its cognizance over suits, actions, and prosecutions rightfully begun therein, and undetermined, would violate the rules of just construction and right reasoning.

Heretofore when a circuit court has been established within a district wherein only a district court had been established with the powers of a district court and of a circuit court, in order to divest the District Court, of its cognizance of cases pending, which belonged to the proper cognizance and jurisdiction of a circuit court, and transfer them into the newly-created Circuit Court, or when new courts have been established, whether circuit courts or district courts, and it was intended by the Congress of the United States to transfer cases pending in the old or preëxisting courts into the newly-created courts, there to be heard, tried, and determined, it has been deemed necessary and proper to employ express and positive enactments to effect such purposes, and they have been used invariably to that end.

Thus in the act of Congress of 13th February, 1801, (2, Stat. at Large, 89,) two sections viz. sec. 20 and 24, were introduced as specially applicable. This act was repealed by 8th March, 1802, (2 Stat. at Large, 132,) and the preceding judicial system reinstated, and sections 4 and 5 introduced to provide for the case.

The act of 24th February, 1807, (2 Stat. at Large, 420,) established Circuit Courts and abridged the jurisdiction of the District Courts in the District of Kentucky, Tennessee, and Ohio, and sec. 3 provided for the transfer of cases.

The act of April 20th, 1818, (3 Stat. at Large, 462,) divided Pennsylvania into two districts, and sections 4 and 6, provided for the transfer of cases.

The act of March 10th, 1824, (4 Stat. at Large, 9,) divided Alabama into two districts, and sec. 5 made the necessary provisions.

The act of 3d March, 1837, (5 Stat. at Large, 176,) erected twelve new Circuit Courts. The third and fourth sections provided for this case.

In these six statutes, last quoted, we have examples of two classes, relative to the divisions of districts and the establishment of courts therein: one class containing enactments for transferring cases, begun and pending in one District Court, to another District Court, established in a part of the territory formerly composing one district; the second class containing express provisions to take away the jurisdiction of district courts, acting as circuit courts, over cases, civil and criminal, begun and pending in such inferior district courts, and to transfer the cognizance thereof to the superior circuit courts newly established in the same districts.

If positive enactments were necessary and proper to divest the jurisdiction of irᶜᵉrior district courts over causes, actions, and pleas rightfully begṯᶰ and pending therein, and to transfer the cognizance thereof to superior circuit courts newly established in the same districts, *a fortiori*, express and positive enactment would be necessary to divest the jurisdiction of a superior court over cases rightfully begun and pending therein, and to transfer the cognizance thereof, from such existing continuing superior court, to an inferior district court newly established within the same territory which composed the district when the proceeding was instituted in the Circuit Court.

We have examples of legislation by Congress by which new judicial districts have been formed out of the old, with total silence as to the cognizance of actions or prosecutions pending in the old, viz.

The act of April 9th, 1814, (3 Stat. at Large, 120,) and the act of February 21st, 1823, (3 Stat. at Large, 726.) In these acts, cases were left to be heard, tried, and determined under the general rule that when once the jurisdiction of a court has rightfully attached by action, writ, or prosecution, instituted, it is not divested by change of circumstances, by mere implication, or otherwise than by express enactment.

The two acts of May 26th, 1824, (4 Stat. at Large, 50,) and May 26th, 1824, (4 Stat. at Large, 48,) took away certain counties and attached them to another district, and no special provision was thought necessary respecting cases then pending.

Furthermore, we have examples of the legislation of the Congress of the United States in dividing one judicial district, in the States of North Carolina, into three judicial districts; thereafter, in consolidating the three into one, and afterwards in dividing that one into three judicial districts, viz.

The act of 9th June, 1794, (1 Stat. at Large, 396); the act of 3d March, 1797, (1 Stat. at Large, 518); the act of 29th April, 1802, (2 Stat at Large, 156.) In these acts there are provisions that there shall be no failure of justice by abatement or discontinuance of the process or lapse of jurisdiction.

The act of 3d April, 1794, (1 Stat. at Large, 352,) transfers jurisdiction from one court to another and provides for the trial of cases.

The various acts of Congress for dividing judicial districts, and for taking off territories or counties from one judicial district and adding them to another, and for consolidation of judicial districts into one, and again for dividing that one into several, and for creating new courts by abolishing some preëxisting, and substituting others in their stead, when compared each with the others, evince, beyond doubt, that the legislature, in framing those statutes, understood and acted upon the following principles and rules of law, viz.

1st. That to abolish the jurisdiction of one existing and continuing court over any of the subjects originally committed to its cognizance, and to transfer such jurisdiction to another court, it was necessary and proper to use words aptly and clearly expressive of such intent.

2d. That when the jurisdiction of a court had once rightfully ested over a cause begun and pending, it was not divested by change of circumstance, but continued with the court, until plainly taken away by the legislature, or until the court itself was abolished.

By these rules the acts of the legislature are to be construed. Otherwise the most unexpected, inconvenient, nay, calamitous consequences would result, with miserable confusion of all justice.

If taking off territory from one judicial district and adding to another *ipso facto* abrogates the jurisdiction of the courts (district and circuit) holden for such diminished district over cases then pending and originated in such territory so taken from one judicial district and added to another, then the people of Virginia, of New York, and of Pennsylvania, would have been thrown into a strange predicament.

United States *v.* Dawson et al.

The statues before cited for dividing the judicial districts in Virginia, New York, and Pennsylvania, respectively, and afterwards for diminishing the one and enlarging the other in each State, made no special provision for, but were silent as to, cases then pending. The courts wherein they were pending, supposing their jurisdiction to have continued, went on to hear and determine them. But if the doctrine now contended for by the counsel for Dawson is to prevail, the said courts had no jurisdiction; their decisions are absolutely void, confer no right, bar no right, and all concerned in executing them were trespassers; for such are the consequences of decisions and sentences of courts not having jurisdiction. Elliot *v.* Piersol, 1 Peters, 340; Wise *v.* Withers, 3 Cranch, 337; Rose *v.* Himely, 4 Cranch, 269.

A question arose upon the before-mentioned act of 1824, May 26, taking away certain counties from the Eastern district of Pennsylvania and adding them to the western district, in an action of ejectment pending in the Circuit Court for the district of Pennsylvania, for land lying in Union county, one of the counties so taken from the eastern and added to the western district. The question was made at the first sitting of the Circuit Court for the district of Pennsylvania after the passage of the act of 1824, whether the said ejectment so instituted and pending at the passage of that act should be retained in the Circuit Court, or be sent to the western district court, acting as a Circuit Court. Upon argument, Mr. Associate Justice Washington and Judge Peters decided that the case should be retained; that the said act had not transferred it to the western district. Lessee of Rhodes and Snyder *v.* Selin, 4 Wash. C. C. Rep. 725.

To combat this decision, the counsel for the accused cites the cases of Picquet *v.* Swan, 5 Mason, 35, and Toland *v.* Sprague, 12 Peters, 300. The case of Piquet *v.* Swan is cited to prove "that title to real estate, by the general principles of law, can be litigated only in the State where the land lies, and where the process may go to find and reach the land and enforce the title of the party." This extract, quoted by the counsel for the accused, is connected with the next preceding and the next succeeding sentence, to actions, in their nature, "purely local;" and immediately afterwards Judge Story explains himself further, by saying "collateral suits for other purposes, binding the conscience, or controlling the acts of the party personally, may be brought and decided elsewhere." 5 Mason, 42. The case did not involve the question of a rightful jurisdiction vested, and sought to be divested by matter subsequent. It was a case brought in the federal court, and district of Massachusetts, by an alien, against a citizen of the United States, then out of the United States, but late of the city of Boston, by color of the

State law and a process called the trustee process, or foreign attachment, and returned by the marshal that he had attached the real estate of the defendant in the district of Massachusetts, summoned the supposed trustees and agent of the defendant, Swan, but that "the said Swan has not been an inhabitant or resident of this district (Massachusetts) for three years last past." Such a suit, Judge Story decided, could not be so commenced in the federal court contrary to the federal law, although allowed by the law of the State of Massachusetts.

In Penn *v.* Lord Baltimore, in the High Court of Chancery of England, respecting the title to land in Maryland, Lord Hardwick decided that it was no objection to the decree for settling the right between the parties, that the land was in Maryland, and not itself to be reached by the process of that court. Penn *v.* Lord Baltimore, 1 Ves. sen. 454, 455.

By the 6th section of the act of 3d March, 1797, (1 Statutes at Large, by L. & B., p. 515, chap. 20,) writs of execution, upon any judgment obtained for the use of the United States in one State, may run and be executed in any other State, or in any of the territories of the United States. Subpœnas for witnesses may run from one district to any other, by act of March 2, 1793, (1 Statutes at Large, by L. & B., p. 335, chap. 22, sec. 6.) And executions "upon judgments or decrees obtained in any of the district or circuit courts of the United States, in any one State, which shall have been, or may hereafter be, divided into two judicial districts, may run and be executed in any part of such State;" act of 20th May, 1826, (4 Statutes at Large, by L. & B., p. 184, chap. 123.) So that the question of jurisdiction was not involved in the case of Picquet *v.* Swan; but only the sufficiency of the process by foreign attachment against the absentee, not served personally with the process, to entitle the plaintiff to judgment by default.

The case of Toland *v.* Sprague, 12 Peters, 300, cited by the counsel of the accused, was not a case of jurisdiction once rightfully vested and sought to be divested by matter subsequent; but a question whether, according to the acts of Congress, a citizen of Pennsylvania could commence a suit in the Circuit Court of the United States for the Eastern District of Pennsylvania, by process of attachment of property within the State, (as authorized by a law of the State,) belonging to the absentee, who was a citizen of the State of Massachusetts. The defendant appeared and pleaded to issue, having moved to quash the process. The court below rendered judgment in chief for the plaintiff for his demand. This court decided that the process of attachment had issued improperly; but as the defendant had appeared and pleaded to issue, this court said:

" Now if the case were one of a want of jurisdiction in the court, it would not, according to the well-established principles, be competent for the parties by any act of theirs to give it. But that is not the case. The court had jurisdiction over the parties, and the matter in dispute ; the objection was, that the party defendant not being an inhabitant of Pennsylvania, nor found therein, personal process could reach him ; and that the process of attachment could only be issued properly against a party under circumstances which subjected him to process *in personam*. Now this was a personal privilege or exemption which it was competent for the party to waive, . . . and that appearing and pleading will produce that waiver." 12 Peters, 330, 331. And thereupon the judgment was affirmed.

These cases do not shake the opinion in the case of Rhodes *v*. Selin, 4 Wash. C. C. Rep. 725. The principle on which it stands, that a jurisdiction once rightfully vested, is not divested by after circumstances, but only by express transfer to some other tribunal, or by express repeal, is sustained by the case of Morgan's heirs *v*. Morgan, 2 Wheat. 297 ; Tyrell *v*. Roundtee, 7 Peters, 467, 468.

The conclusion in the case of Rhodes *v*. Selin, and which is here maintained, is not a novelty or anomaly, as seems to be assumed in behalf of the defendant ; it is but a single instance of a general doctrine of statute construction, which is this :

If part of a defined territory, having functions or duties political, judicial, municipal, or other, be separated from it, either by annexion to another, or by being converted into a new political, judicial, municipal, or other entity, then the remaining part of the territory, or the former public body, retains all its property, powers, rights, and privileges, and remains subject to all its obligations and duties, unless some express provisions to the contrary be made by the act authorizing the separation.

The counsel for the accused relies upon the Constitution of the United States as amended, for an argument against the jurisdiction of the Circuit Court of Arkansas.

The Constitution, in art. 3, sec. 2, provides : " The trial of all crimes, except in cases of impeachment, shall be by jury ; and such trial shall be held in the State, where the said crimes shall have been committed ; but when not committed within any State, the trial shall be at such place or places as the Congress may by law have directed."

This provision authorized the act of Congress, which prescribed that the trial of the crime charged in the indictment as committed in the Indian country, out of the limits of any State, should be had in the Circuit Court of Arkansas.

The 6th article of the amendments to the Constitution, that

" the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law," does not conflict with the law for defining the place and district for the trial of Dawson. He committed the crime in no State. He was indicted within a district defined and ascertained by law before the crime itself was committed; therefore within the letter and within the spirit and meaning of the Constitution, howsoever the words — " which district shall have been previously ascertained by law " — may be construed to mean before the crime was committed, or before the trial. The Constitution does not intend that crimes committed by citizens of the United States on board of our vessels on the high seas, or out of any State, or in the Indian nations and tribes within the United States, should go unpunished.

This amendment of the Constitution applies only where the offence has been committed in a State. Then the trial must be in that State, and the district " previously ascertained by law " must be within that State. But where the crime is not committed in any State of this Union, the trial may be wherever within the jurisdiction of the United States the Congress shall by law direct.

Finally, it is insisted for the United States that the jurisdiction vested rightfully in the Circuit Court of Arkansas, by the indictment therein found; and as that court is in being, unrepealed, and continuing in full power and activity as a Circuit Court of the United States, that jurisdiction and cognizance to try the crime charged in the indictment continues; that it is neither abrogated nor transferred to any other tribunal by the said subsequent act of 1851. If the legislature had intended to transfer the cognizance of pending cases, civil or criminal, they would have used the express words and enactments to that end, which they had employed in so many previous like cases.

Mr. Justice NELSON delivered the opinion of the court.

The defendant was indicted, in the Circuit Court of the United States for the District of Arkansas, for the alleged murder of one Seaborn Hill, in the Indian country west of the State of Arkansas.

The defendant is a white man, and so was Hill, the deceased.

At a Circuit Court held at the city of Little Rock, on the 28th of April, 1853, the indictment came on for trial before the judges of that court; whereupon a motion was made, on behalf of the defendant, to quash the indictment, for want of jurisdiction of the court to try the same.

And, upon the argument, the judges being divided in opinion,

the following question was certified to this court for its decision.

1. Did the act of Congress entitled "An act to divide the District of Arkansas into two judicial districts," approved the 3d of March, 1851, by which the Western District of Arkansas was created, take away the power and jurisdiction of the Circuit Court of the United States for the Eastern District to try the indictment pending against the prisoner, James L. Dawson, a white man, found in the Circuit Court of the United States for the District of Arkansas, by a grand jury impanelled on the 16th April, 1845, for feloniously killing Seaborn Hill, a white man, on the 8th of July, 1844, in the country belonging to the Creek nation of Indians west of Arkansas, and which formed a part of the Indian country annexed to the judicial district of Arkansas, by the act of Congress approved on the 17th of June, 1844, "An act supplementary to the act entitled 'An act to regulate trade and intercourse with Indian tribes, and to preserve peace on the frontiers,'" passed 30th of June, 1834.

To state the question presented for our decision in a more simple form, it is this: At the time the State of Arkansas composed but one judicial district, in which the federal courts were held, the Indian country lying west of the State was annexed to it for the trial of crimes committed therein by persons other than Indians. In this condition of the jurisdiction of these courts, the crime in question was committed in the Indian country, and the indictment found in the Circuit Court, at the April term, 1845, while sitting at the city of Little Rock, the place of holding the court.

Subsequent to this, the State was divided into two judicial districts, the one called the Eastern, the other the Western District of Arkansas. The Indian country was attached to and has since belonged to the western district. The question presented for our decision is, whether or not the Circuit Court for the Eastern District is competent to try this indictment, since change in the arrangements of the districts.

By the 24th section of act of Congress, June 30th, 1834, (4 Stat. at Large, 733,) it was provided, that all that part of the Indian country west of the Mississippi river, bounded north by the northern boundary of lands assigned to the Osage tribe of Indians, west by the Mexican possessions, south by Red river, and east by the west line of the Territory of Arkansas, and State of Missouri, should be annexed to the territorial government of Arkansas, for the sole purpose of carrying the several provisions of the act into effect. And the 25th section enacted, that so much of the laws of the United States as provides for the punishment of crimes committed within any place within

the sole and exclusive jurisdiction of the United States, shall be in force in the Indian country, provided the same shall not extend to crimes committed by one Indian against the person or property of another Indian.

The act of Congress, June 7th, 1844, (5 Stat. at Large, 680,) which was enacted after the Territory of Arkansas became a State, provided, that the courts of the United States for the District of the State of Arkansas, should be vested with the same power and jurisdiction to punish crimes committed within the Indian country designated in the 24th section of the act of 1834, and therein annexed to the Territory of Arkansas, as were vested in the courts of the United States for said territory before the same became a State; and that, for the sole purpose of carrying the act into effect, all that Indian country theretofore annexed by said 24th section to the said territory, should be annexed to the State of Arkansas.

As we have already stated, the crime in question was committed in this Indian country after it was annexed, for the purposes stated, to the State of Arkansas; and the indictment was found in the Circuit Court of the United States for the District of Arkansas, which, we have seen, was coextensive with the State. And, if no change had taken place in the arrangement of the district, before the trial, there could, of course, have been no question as to the jurisdiction of the court.

But by the act of Congress, 3d March, 1851, it was provided, that the counties of Benton and eight others enumerated, and all that part of the Indian country annexed to the State of Arkansas for the purposes stated, should constitute a new judicial district, to be styled " The Western District of Arkansas," and the residue of said State should be and remain a judicial district, to be styled " The Eastern District of Arkansas."

The 2d section provides, that the judge of the District Court should hold two terms of his court in this western district in each year at Van Buren, the county seat in Crawford county. And the third confers upon him, in addition to the ordinary powers of a district court, jurisdiction within the district, of all causes, civil or criminal, except appeals and writs of error, which are cognizable before a circuit court of the United States. The fourth provides for the appointment of a district-attorney and marshal for the district, and also for a clerk of the court.

It will be seen, on a careful perusal of this act, that it simply erects a new judicial district out of nine of the western counties in the State, together with the Indian country, and confers on the district judge, besides the jurisdiction already possessed, circuit court powers within the district, subject to the limitation as to appeals and writs of error; leaving the powers and juris-

diction of the circuit and district courts as they existed in the remaining portion of the State, untouched. These remain and continue within the district after the change, the same as before; the only effect being to restrict the territory over which the jurisdiction extends. Hence no provision is made as to the time or place of holding the circuit or district courts in the district, or in respect to the officers of the courts, such as district-attorney, marshal, or clerk, or for organizing the courts for the despatch of their business. These are all provided for under the old organization. 5 Stat. at Large, 50, 51, 176, 177, 178.

We do not, therefore, perceive any objection to the jurisdiction of these courts over cases pending at the time the change took place, civil and criminal, inasmuch as the erection of the new district was not intended to affect it in respect to such cases, nor has it, in our judgment, necessarily operated to deprive them of it.

It has been supposed that a provision in the sixth amendment of the Constitution of the United States has a bearing upon this question, which provides, that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." The argument is, that, since the erection of the new district out of the nine western counties in the State, together with the Indian country, it is not competent for the Circuit Court, in view of this amendment, to try the prisoners within the remaining portion of the old district, inasmuch as that amendment requires the district within which the offence is committed, and the trial is to be had, must be ascertained and fixed previous to the commission of the offence.

But it will be seen from the words of this amendment, that it applies only to the case of offences committed within the limits of a State; and, whatever might be our conclusion if this offence had been committed within the State of Arkansas, it is sufficient here to say, so far as it respects the objection, that the offence was committed out of its limit, and within the Indian country.

The language of the amendment is too particular and specific to leave any doubt about it: " The accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall be committed, which district shall have been previously ascertained by law."

The only regulation in the Constitution, as it respects crimes committed out of the limits of a State, is to be found in the 3d art., sec. 2, of the Constitution, as follows: " The trial of crimes, except in cases of impeachment, shall be by jury, and such trial

shall be held in the State where the said crimes shall have been committed; but when not committed within any State, the trial shall be at such place or places as the Congress may, by law, have directed."

Accordingly, in the first crimes act, passed April 30, 1790, § 8, (1 Statutes at Large, p. 114,) it was provided, that "the trial of crimes committed on the high seas, or in any place out of the jurisdiction of any particular State, shall be in the district where the offender is apprehended, or into which he may first be brought."

A crime, therefore, committed against the laws of the United States, out of the limits of a State, is not local, but may be tried at such place as Congress shall designate by law.

This furnishes an answer to the argument against the jurisdiction of the court, as it respects venue, trial in the county, and jury from the vicinage, as well as in respect to the necessity of particular or fixed districts before the offence.

These considerations have no application or bearing upon the question.

In this case, by the annexation of the Indian country to the State of Arkansas, in pursuance of the act of 1844, for the punishment of crimes committed in that country, the place of indictment and trial was in the Circuit Court of the United States for that State, in which the indictment has been found, and was pending in 1851, when the Western District was set off; and as that change did not affect the jurisdiction of the court, as it respected pending cases, but remained the same after the alteration of the district as before, it follows that the trial of the indictment in this court will be at the place and in the court as prescribed by law, which is all that is required in the case of an offence committed out of the limits of a State.

We shall direct, therefore, an answer in the negative, to be certified to the court below, to the first question sent up for our decision, as we are of opinion the court possesses jurisdiction to hear and give judgment on the indictment.

The second question sent up in the division of opinion is as follows:

Can the District Court of the United States, for the Western District of Arkansas, take jurisdiction of the case aforesaid, upon the indictment aforesaid, so found, in the year 1845, in said Circuit Court, for the District of Arkansas?

As our conclusion upon the first question supersedes the necessity of passing upon the second, it will be unnecessary to examine it, and shall, therefore, confine our answer and certificate to the court below to the first.

Mr. Justice McLEAN dissented.

Mr. Justice McLEAN,

The facts and law of this case, as I understand them, have led me to a different conclusion from that of a majority of the court. The twenty-fourth section of the act of the 30th June, 1834, after making various provisions, defining the limits of the Indian country, and imposing penalties for several offences by white persons, provides, "that for the sole purpose of carrying this act into effect, the Indian country, bounded east by Arkansas and Missouri, west by Mexico, north by the Osage country, and south by Red River, shall be, and hereby is, annexed to the Territory of Arkansas."

On the 8th of July, 1844, a murder was committed at the Creek agency, in the Creek country, west of Arkansas, for which the grand jury found a bill of indictment in the Circuit Court of Arkansas, at April term, 1845.

By an act of March 3, 1851, it is provided, "that from and after the passage of this act, the counties of Benton, Washington, Crawford, Scott, Polk, Franklin, Johnson, Madison, and Carroll, and all that part of the Indian country lying within the present judicial district of Arkansas, shall constitute a new judicial district, to be styled, the Western District of Arkansas; and the residue of said State shall be and remain a judicial district, to be styled, the Eastern District of Arkansas."

After the division of the district, Dawson, the defendant, was arrested for the alleged murder; and the question, whether the Circuit Court of the United States, sitting within the Eastern District, has jurisdiction to try the case, has been referred to this court.

When the offence was committed, and the indictment was found, the District of Arkansas included the State and the Indian country described; but when the defendant was arrested, and the case was called for trial, the district had been divided; and the question is raised in the Eastern District, the murder having been committed in the Western.

In the act dividing the district, Congress had power to provide that all offences, committed in the district before the division, should be tried in the Eastern District. But no such provision being made, the question is, whether the jurisdiction may be exercised in that district without it.

Since the division of the district, capital punishments have been inflicted in the Western District for offences committed before the division. This deprived the accused of no rights which they could claim under the Constitution of the United States, or the laws of the Union. The sixth article of the

amendment to the Constitution declares that, "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law."

As the State and district are connected by the copulative conjunction, in this provision, the case before us is not technically within it. The crime is alleged to have been committed within the Indian country, which the district includes, but it is not within the State. But the case appears to me to be within the policy of the provision. Nine counties of the State of Arkansas are within the district, and from which the jury to try the defendant might be summoned. This brings the case substantially within the above provision. Had the place of the murder been within one of the above counties, the constitutional provisions must have governed the case. All the rights guaranteed by the Constitution would have been secured to the criminal by a trial in the Western District; but those rights are not realized by him on a trial in the Eastern District. And that is made the place of trial because the alleged murder was not committed within the State.

In the 2d section of the 3d article of the Constitution, it is declared that "the trials of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the State where the said crimes shall have been committed; but, when not committed within any State, the trial shall be at such place or places as the Congress may by law have directed." The latter clause of this provision covers the case now before us. The crime charged was not committed within any State; but it was committed within a district, within which such offences are to be tried, as "directed by Congress." And there seems to me to be no authority to try such an offender in any other district, or at any other place. The act of 1834 provides that an offender, under the act, when arrested, should be sent for trial to the district where jurisdiction may be exercised.

The punishments inflicted in the Western District of Arkansas, for crimes committed before the division of the district, were in accordance with the above provision of the Constitution and the principles of the common law, both of which are opposed to a trial of the same offences in the Eastern District. The tribunal is the same in both districts, except the circuit judge may not be bound to attend the Western District; but the Western District includes the place of the crime which, by the laws of England and of this country, is the criterion of jurisdiction in criminal cases. This is never departed from, where the limits of the jurisdiction are prescribed.

On what ground can jurisdiction be exercised in the Eastern District? Not, I presume, on the ground that the crime was committed before the district was divided. If this be assumed and sustained, the capital punishments which have been inflicted in the Western District, for similar offences, have been without authority. The offenders have been tried, and they have had, substantially, the benefits secured by the Constitution. They have had a jury from the district, and as near the vicinage as practicable. These privileges they would not have realized had they been tried in the Eastern District. If tried in the Eastern District, the jury must have been summoned from that district, and not from the district in which the offence was committed. The considerations in favor of the Western District, as the legal place of trial, greatly outweigh, it seems to me, any that can arise in favor of the Eastern District.

There is, however, a fact which may be supposed of great weight in deciding the question; and that is, the indictment was found before the division of the district. I will examine this. It is admitted the jurisdiction was in the Circuit Court for the entire district, when the indictment was found. This gave jurisdiction; but every step taken in the cause, subsequent to the finding of the bill, is as much the exercise of jurisdiction as the finding of the bill.

The establishment of the Western District, in effect, repealed the jurisdiction of the Eastern District, as to causes of action arising in the Western District, as fully as if the law had declared, "no jurisdiction shall hereafter be taken in any case, civil or criminal, which is of a local character, and arises in the Western District. Offences committed in that district are made local by the acts of Congress. This is not a case where, if jurisdiction once attaches, the court may finally determine the matter. There seems to me to be no reason for such a rule in a criminal case, especially when it is opposed to the policy of the Constitution and to the principles of common law.

A case lately decided in this court may have some bearing on this question. Under the fugitive slave law of 1793, certain penalties were inflicted for aiding a fugitive from labor to escape. A number of actions were brought in several of the States — in Ohio, Indiana, and Michigan—for the recovery of this penalty; but it was set up in defence, that this penalty was repealed by repugnant provisions in the law of 1850, on the same subject, and this court so held. The actions which had been pending for years were stricken from the docket. But it may be said the repeal, in the case stated, operated on the right of action. This is admitted. And so, it may be said, the Western District was repugnant to the Eastern, so far as causes of

local actions arise in the Western District; and is not this repugnancy as fatal to the trial, as the repeal of the penalty in the act of 1793?

All this difficulty arises from an omission of Congress to make, in the law dividing the district, the necessary provision; and it appears to me that we have no power, by construction or otherwise, to supply the omission. This could not be done in an action of ejectment. A writ of possession, in such a case, could not be issued to the Western District on a judgment entered in the Eastern. And if such a jurisdiction could not be sustained in a civil action, much less could it be sustained in a criminal case.

If a person guilty of a crime in the Indian country, before the division, could not be indicted and tried in the Eastern District, it follows, that the fact of the crime having been committed in the Indian country, can afford no ground of jurisdiction in the present case. It must rest alone, then, it would seem, for jurisdiction, on the ground that, the indictment having been found in the Eastern District, the same jurisdiction may try the defendants, and, if found guilty, sentence them to be executed. This view must overcome the locality of the crime, and the right which the defendants may claim, to have a jury as near the vicinage as practicable, at least a jury from the district where the crime was committed. These appear to me to be objections entitled to great consideration. A jurisdiction in so important a case should not be maintained under reasonable doubts of its legality.

The cases referred to in the argument to retain the jurisdiction, do not, as it appears to me, overcome the objections. Numerous instances are cited where the territory of a judicial district has been changed, provision being made in the act, that the jurisdiction should be continued where suits had been commenced. This shows the necessity of such a provision, and is an argument against the exercise of the jurisdiction, where no provision has been made. And in those cases, like the present, where a district has been changed, without any provision, as to jurisdiction, there is no exercise of it shown, in a criminal case, especially where the punishment is death.

Where jurisdiction attaches from the citizenship of the parties, a change of residence does not affect the jurisdiction. The case of Tyrell *v.* Roundtree, 7 Peters, 464, seems to have no bearing upon this question. That action was commenced by an attachment, which was laid upon the land before the division of the county; and this court said, the land remained in the custody of the officer subject to the judgment of the court. An interest was vested in him for the purposes of that judgment.

United States *v.* Dawson et al.

The judgment was not a general lien on it, but was a specific appropriation of the property itself. And they say the division of the county could not divest this vested interest, or deprive the officer of the power to finish a process, which was rightly begun.

There may be cases where counties have been divided after jurisdiction was taken in a local action, and the suit has been carried into judgment, but such cases afford no authority in the present case.

The case relied upon as in point in 4 Washington C. C. Rep 725, the court said, "at the first or second session of this court, which succeeded the passage of the act of 1824, which added this and other counties to the western judicial district, we were called upon to decide, whether the present action, together with some others, then on our docket for trial, together with the papers belonging to them, should be sent to the Western District or retained here. After hearing counsel on the question, the opinion of the court was, that those cases were not embraced either by the word or by the obvious intention and policy of the act."

This does not appear to be a well-considered case. The counties were annexed to another jurisdiction, and yet the court speak of " the obvious intention and policy of the act," and on that ground entertain jurisdiction over cases pending in the former district. This was right in regard to transitory actions, but not where the actions were of a local character.

## Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States, for the Eastern District of Arkansas, and on the points or questions, on which the judges of the said Circuit Court were opposed in opinion, and which were certified to this court for its opinion, agreeably to the act of Congress, in such case made and provided, and was argued by counsel. On consideration whereof, it is the opinion of this court, that the act of Congress entitled "An act to divide the District of Arkansas into two judicial districts," approved the third day of March, in the year of our Lord one thousand eight hundred and fifty-one, whereby the Western District of Arkansas was created and defined, did not take away the power and jurisdiction of the Circuit Court of the United States for the Eastern District of Arkansas, so that it can proceed to hear, try, and determine a prosecution for murder, pending against the prisoner, James L. Dawson, a white man and not an Indian, upon an indictment, found, presented, and re-

turned into the Circuit Court of the United States, for the district of Arkansas, by the grand jury impanelled for that district, upon the 16th day of April, in the year of our Lord one thousand eight hundred and forty-five, against said James L. Dawson, a white man, for the felonious killing of Seaborn Hill, another white man and not an Indian, on the eighth day of July, A. D. 1844, in that county, belonging to the Creek nation of Indians, west of Arkansas, and which formed a part of the Indian country annexed to the judicial district of Arkansas by the act of Congress, approved the seventeenth day of June, A. D. 1844, entitled "An act supplementary to the act entitled 'An act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers, passed thirtieth June, one thousand eight hundred and thirty-four,'" in which cause, so pending, no trial has yet been had. And that this answer to the first question supersedes the necessity of any answer to the second question.

Whereupon it is now here ordered and adjudged by this court, that it be so certified to the said Circuit Court.