BEEKMAN *v.* HUDSON RIVER WEST SHORE RY. CO. *et al.*

(*Circuit Court, S. D. New York.* April 27, 1888.)

1. COURTS — FEDERAL DISTRICTS — SOUTHERN DISTRICT OF NEW YORK — WEST POINT RESERVATION.

The United States reservation at West Point, in the state of New York, is within the "Southern district of New York," and the circuit court of that district has jurisdiction of a bill to foreclose a mortgage executed by a railroad company upon its right of way through that reservation granted it by congress, and its improvements thereon.

2. SAME — CONFLICT OF STATE AND FEDERAL JURISDICTION.

The pendency in the state courts of a suit by the trustees of a railroad mortgage to foreclose is not a bar to a similar suit in the federal court by a bondholder secured thereby.

3. EQUITY—LACHES—DEMURRER.
   Where the delay on the part of a bondholder under a railroad mortgage in bringing suit to foreclose is for a period less than that fixed by the statute of limitations, the fact of such delay is a mixed question of law and fact, and cannot be passed upon on demurrer to the bill.

4. RAILROAD COMPANIES — BONDS AND MORTGAGES — FORECLOSURE — SUIT BY BONDHOLDER.
   A railroad mortgage provided that, in case of default in interest for four months, the principal should become due, and that the trustees should, "upon written request of the holders of a majority in amount of * * * outstanding bonds, * * * proceed to foreclose the mortgage" within a reasonable time. Acting upon such request, the trustees filed a bill to foreclose in the state courts, which was dismissed in special term for want of jurisdiction of the subject-matter. The trustees took an appeal, but, before it was determined, a bondholder urged the trustees to renew the litigation in the federal courts, and, upon their refusal to do so, brought the suit there himself, and in his own name. Held, on demurrer to the bill, that, to the extent of accrued and unpaid interest, the suit was properly brought.

5. SAME—PARTIES.
   A bill to foreclose a railroad mortgage executed by two companies, the H. and the W., set out the respective incorporations; a grant of way to the H.; the practical consolidation of the two companies; and the expenditure of a large sum of money by the consolidation upon the construction of a road over such right of way, and the execution of the mortgage thereon. It then traced the franchise through many conveyances, until it ultimately passed into the hands of the S. road, and was leased by it to the C. road. Held, on demurrer to bill, that the S. and the C. companies were properly made parties, being respectively owner of the equity and lessee in possession of the mortgaged premises.

6. SAME—CORPORATE EXISTENCE OF MORTGAGOR—ESTOPPEL TO QUESTION.
   Two railroad companies, the C. and the S., parties to a bill to foreclose a mortgage on the road in their hands, demurred to the bill on the ground that the H. company, which, with the W. company, had executed the mortgage, had never been duly incorporated. The original franchise had been granted the H. company, and the S. company had succeeded to the franchise through various mesne conveyances, and had leased it to the C. company for 975 years. It did not appear that the validity of the incorporation of the H. company had ever been questioned in direct proceedings by the state, or by those interested in the incorporation. It was also averred that the H. company had acted continuously as a corporation, had acquired the mortgaged premises as such, and as such had executed the mortgage, received the proceeds of the bonds in suit, and put them into the construction and operation of the road. Held, that the demurrants were estopped to question the incorporation, which was their only source of title.

7. SAME—ESTOPPEL TO DENY VALIDITY OF MORTGAGE.
   A joint railroad mortgage, executed by the H. company and the W. company, covered "all and singular the railways of each, constructed or hereafter to be constructed, and also all and singular the franchises now owned by each or either for the purpose of building and operating their respective lines of railway," etc. The bonds secured by the mortgage were those of the W. company, issued for the purpose of enabling it to acquire a lease of the road and entire property, including a valuable franchise, of the H. company, and to build, furnish, and operate its own road. The H. company then leased its franchise for the full corporate term to the W. company, and transferred to it its entire capital stock. The said railroad property and franchises passed through various mesne assignments into the hands of the S. company, who leased them to the C. company Held, on demurrer to bill to foreclose the mortgage, that the S. and C. companies were estopped to dispute its validity.

In Equity. Bill for foreclosure of a railroad mortgage, receiver, and account. On demurrer to bill.

This suit is brought by the complainant, a citizen of New Jersey, the holder of 15 bonds of $1,000 each, made and dated June 1, 1868, by

the defendant the West Shore Hudson River Railroad Company, payable 20 years from their date, with interest payable semi-annually on December 1st and June 1st. These bonds, with others of the same issue, are, it is averred, secured by a deed of trust or mortgage of even date made by said obligor company and the Hudson River West Shore Railroad Company to the defendants Murdock and Duncan, as trustees, on certain premises and franchises particularly described therein. The defendants are all citizens of the state of New York, and complainant's suit is brought to enforce his rights and equities as the holder of such bonds, and as a *cestui que trust* under said trust deed or mortgage. The entire authorized issue of bonds of which the complainant's form a part, was 2,000 bonds, aggregating $2,000,000, of which $841,000 were actually issued. All have been extinguished except 144 bonds.

On September 16, 1867, the Hudson River West Shore Railroad Company was organized for the purpose of constructing, maintaining, and operating a railroad, commencing at Piermont, Rockland county, and terminating at Newburgh, Orange county, in the state of New York. It duly located and adopted its route between these two points,—a route which passed across property belonging to the United States at West Point on the Hudson river. By an act of congress, approved December 14, 1867, (15 St. U. S. 33,) the consent of the United States was given to the said defendant the Hudson River West Shore Railroad Company, to locate, construct, and operate its railroad on the shore line across the property belonging to the United States government at West Point, in the state of New York, upon such location, and under such regulations as should be approved by the secretary of war. Thereafter said secretary of war duly approved a location for the line across the government reservation, and prescribed and approved certain regulations governing and under which said railroad should be constructed and operated. On October 26, 1867, the defendant the West Shore Hudson River Railroad Company was organized "for the purpose of operating a railroad from a point in the boundary line between the states of New Jersey and New York on or near the west bank of the Hudson river, extending northwardly to the aforesaid village of Piermont, in Rockland county, N. Y., and intersecting with the Erie Railroad and the southern terminus of the above-mentioned Hudson River West Shore Railroad; also commencing at the northern terminus of the aforesaid Hudson River West Shore Railroad, as the same had been, was, or might thereafter be located, at or near the city of Newburgh, Orange county, N. Y., and extending northerly along the west bank of the said Hudson river, through the counties of Orange, Ulster, Columbia, and Greene, and terminating at Athens, in said county of Greene, state of New York, together with all and singular the powers, rights, and franchises of a railroad corporation incident thereto." Thereafter the West Shore Hudson River Railroad Company located and adopted its said route.

Prior to the making of the bonds and mortgage,—though at what precise date the bill of complaint does not disclose,—an agreement was made between these two corporations, by which it was agreed that the

Hudson River West Shore Railroad Company should build and construct its road as fast as possible, and that, as soon as the said road should be built and constructed, it would lease its railroad and all the lands whereon it was built, and the rights, easements, franchises, and privileges con-- nected therewith, for the full and then unexpired term of its charter, to the said West Shore Hudson River Railroad Company aforesaid, on certain terms and conditions therein expressed, (but apparently not disclosed in the bill;) and by which said agreement it was also in substance provided that the said last-named company should be entitled to receive said lease as soon as it should have paid the moneys which may have been expended by the former company in the purchase of its rights of way, location, construction, etc., or should have assumed or become responsible for, or obligated to pay, the same, and that all sums which should be furnished by the said West Shore Hudson River Railroad Company to, or paid, laid out, and expended, for the benefit of, the Hudson River West Shore Railroad Company, and all bonds made by the West Shore Hudson River Railroad Company, and delivered to the Hudson River West Shore Railroad Company, or applied or appropriated to its use and benefit, should be credited on account of said moneys.    The bonds in question were issued by the West Shore Hudson River Railroad Company for the purpose of enabling it to carry out this agreement, to acquire said lease, and to complete and operate its road.    The mortgage, which is made by both these companies, refers to the agreement as to the issue of bonds, and mortgages the railways of the parties of the first part thereto, constructed or thereafter to be constructed, within certain specified limits, and also all other property then owned or thereafter to be acquired, and appertaining or belonging to or connected with the lines of railway so mortgaged, or the running or operating the same.    Ten days after the making of the mortgage, and in pursuance of the agreement above referred to, the entire capital stock of the Hudson River West Shore Railroad Company was transferred to the West Shore Hudson River Railroad Company, and all the estate, property, rights, privileges, locations, and franchises of the former company were transferred and leased to, and thereafter were held and possessed by, the said West Shore Hudson River Railroad Company.    After proper action had by the secretary of war, the Hudson River West Shore Railroad Company commenced the building of its road, and the excavation of a tunnel in the line thereof, through and across said property of the United States at West Point; and the said railroad has since been constructed and operated through and across said property, in compliance with the regulations of the secretary of war.

On July 13, 1870, the New York, West Shore & Chicago Railroad Company was organized for the purpose of constructing and operating a railroad along the west shore of the Hudson river, and in locating its route it adopted the lines of the West Shore Hudson River Railroad Company, and of the Hudson River West Shore Railroad Company, respectively, through the counties of Orange and Rockland.    On April 10, 1871, said New York, West Shore & Chicago Railroad Company mortgaged its property, including such as it might in any manner thereafter acquire

in any lands, rights of way, easements, property, or franchises of the aforesaid Hudson River West Shore Railroad Company, and the aforesaid West Shore Hudson River Railroad Company. On July 21, 1871, the West Shore Hudson River Railroad Company transferred and set over to the New York, West Shore & Chicago Railroad Company all its property, franchises, etc., including those of the Hudson River West Shore Railroad Company, and all its interest and property therein, and the capital stock of the West Shore Hudson River Railroad Company, and also the capital stock of the Hudson River West Shore Railroad Company. The mortgage of the New York, West Shore & Chicago Railroad Company was foreclosed May 4, 1878, and a deed on foreclosure given to a purchasing committee February 7, 1879.

On February 18, 1880, the New York, West Shore & Buffalo Railway Company was organized for the purpose of constructing and operating a railroad on the west shore of the Hudson river, and by its filed maps adopted in whole or in part the line of route of the above-mentioned West Shore Hudson River Railroad Company and of the Hudson River West Shore Railroad Company.

On April 3, 1880, the North River Railway Company was also organized for the purpose of constructing and operating a railroad on the west bank of the Hudson river, and it also adopted in whole or in part the lines and locations of the said two original roads.

The purchasing committee referred to above transferred its purchase, August 5, 1880, to Conrad N. Jordan, who, on August 27, 1880, transferred the same to the New York, West Shore & Buffalo Railway Company. On the same day the said New York, West Shore & Buffalo Railway Company transferred all its railroad, rights of way, property, franchises, etc., in the counties of Rockland and Orange (including the premises in question) to the North River Railway Company.

On May 5, 1881, the North River Railroad Company was organized, being formed by a consolidation of the North River Railway Company with another corporation. On May 12, 1881, the New York, West Shore & Buffalo Railway Company further ratified and confirmed the transfer of August 27, 1880. On or about June 14, 1881, the North River Railroad Company was duly consolidated with the New York, West Shore & Buffalo Railway Company, under the name of the New York, West Shore & Buffalo Railway Company. The last-named company, on August 5, 1881, executed a mortgage covering all its property. In 1885 this mortgage was foreclosed, and on December 5, 1885, deed on foreclosure was given to J. Pierrepont Morgan and two others.

On December 5, 1885, the West Shore Railroad Company was organized, its route coinciding with the original line on the premises in question; and the same day Morgan and his two associates transferred to the last-named company all the property, rights, and easements late of the New York, West Shore & Buffalo Railway Company. On the same day, December 5, 1885, the West Shore Railroad Company leased the property in question to the New York Central & Hudson River Railroad Company for the period of 975 years.

Such further facts as it may be necessary to refer to will be found set forth in the opinion.

*Ashbel Green* and *Howard Mansfield,* for the demurrer.

*Frank F. Van Derveer,* (*Adrian H. Joline* and *William Allen Butler,* of counsel,) *contra.*

LACOMBE, J. 1. The first ground of demurrer suggested is that this court has no jurisdiction of the subject-matter of the suit; that it is a suit *in rem,* to establish the lien of a mortgage, and foreclose the same; and that the mortgaged premises are wholly in territory not within the Southern district of New York. By certain acts of the legislature of New York, the jurisdiction of that state in and over the land belonging to the United States at West Point was ceded to the federal government. Ownership of and jurisdiction over such territory are both in the United States, and therefore, as demurrants contend, "those lands are wholly excluded from the territory of the state." By section 541 of the Revised Statutes of the United States, the state of New York is divided into three districts, the Northern and Eastern of which are described as including certain counties of said state, with the waters thereof, while the Southern district is defined as including "the residue of said state, with the waters thereof." Hence it is contended that the government reservation, being no longer a part of the state for any purpose, is not included within such residue, and therefore is not within the Southern district of New York. The authorities, cited in support of this proposition fall within one or other of two groups. To the first belong such decisions as that of the New York supreme court in *Murdock* v. *Railway Co.,* Orange special term, December, 1885, which was a suit brought by the trustees, who are defendants here, to foreclose this very mortgage. They hold that when the state has by express statute turned over to the federal government a portion of its territory, indicating in plain language its intention no longer to claim or exercise jurisdiction therein, the inhabitants of the ceded tract thereafter neither have political nor civil rights, nor are liable to the burdens of citzenship under the laws of the state. Inasmuch as the federal constitution, art. 1, § 8, subd. 16, authorizes congress to exercise exclusive jurisdiction over such places, state statutes abandoning state jurisdiction therein are held to have accomplished their evident intent. State jurisdiction is thereafter at an end. To this group belong *Dibble* v. *Clapp,* 31 How. Pr. 420; *Com.* v. *Clary,* 8 Mass. 72, 1 Metc. 580; *Mitchell* v. *Tibbetts,* 17 Pick. 298. To the other group belong those cases in which it is held that when congress in organizing territorial governments, or establishing the limits of jurisdiction for some particular tribunal, has expressly excepted certain lands out of such jurisdiction or government, they constitute no part of such territory or district, although they are included within its geographical boundaries. Here again the federal statute is interpreted according to its plain intent. To this group of cases belong *U. S.* v. *Dawson,* 15 How. 467; *Langford* v. *Monteith,* 102 U. S. 145; *Harkness* v. *Hyde,* 98 U. S. 476. The question raised by the demurrer in this case, however, is controlled by none of the decisions above cited.

By section 2 of the act of September 24, 1789, "to establish the judicial courts of the United States," (chapter 20, 1 St. at Large, 73,) the United States were divided "into thirteen districts, to be limited and called as follows: * * * One to consist of the state of New York, and to be called 'New York District,' etc." By this act the lands in question were undoubtedly included in the district named. What, if anything, has taken them out of it? The earliest state statute cited in the briefs of counsel ceding jurisdiction to lands at West Point is chapter 64 of 1826. Later acts are found as chapter 359 of 1875, and chapter 410 of 1876. It may be that there are earlier statutes bearing on the subject, but it is altogether improbable that any of them antedated the establishment of the military academy in 1802. These state statutes, however, are of course powerless to effect an amendment of a federal statute, under which congress has regulated the exercise of federal jurisdiction by federal courts. Such an amendment must be found, if at all, in the federal statutes themselves. In 1814 (chapter 49, 3 St. at Large, 120) the state of New York was, "for the more convenient transaction of business in the courts of the United States," divided into two districts, "in manner following, to-wit: The counties of Rensselaer, Albany, Schenectady, Schoharie, and Delaware, together with all that part of the said state lying south of the said above-named counties, shall compose one district, to be called the 'Southern District of New York;' all the remaining part of said state shall compose another district, to be called the 'Northern District of New York.'" In 1818 (chapter 32, 3 St. at Large, 414) the counties of Albany, Rensselaer, Schenectady, Schoharie, and Delaware were transferred from the Southern to the Northern district. These statutes were passed before the first state act of cession above cited, and when, for all that appears in this case, the lands in question were politically, as well as geographically, a part of the state of New York. Even had the cession been made before their passage, however, it could not fairly be claimed that, by an act plainly providing solely for the division of a district already provided by law with the machinery by which federal jurisdiction was exercised in every part of it, some portion of the district so divided was deprived of the exercise of that machinery altogether. The intention of the legislature, when plainly deducible from the language used, will prevail over a mere verbal construction. *Wilkinson* v. *Leland,* 2 Pet. 627; *Brown* v. *Barry,* 3 Dall. 365; *U. S.* v. *Freeman,* 3 How. 562. It is manifest from an examination of these acts that congress, finding that the judicial machine they had provided in 1789 for the New York district was insufficient to dispose of all the cases cognizable in existing federal courts, undertook to provide additional courts to dispose of them. That in so doing they intended to bar any part of the old district out of the jurisdiction of both the original and the supplemental courts is a conclusion unwarranted by anything in the statute. The same remarks apply to the act creating the Eastern district, (Act Feb. 25, 1865; chapter 54, 13 St. at Large, 438,) and to the Revised Statutes, § 541, which, after defining the Northern and Eastern districts, describes the Southern district as including "the residue of said state, with the waters thereon."

No federal statute passed subsequent to the creation of the New York district, and accepting the cession of these lands, is cited by counsel. It appears that in 1790 (chapter 26, 1 St. at Large, 129) "the president was authorized to cause to be purchased for the use of the United States the whole or such part of that tract of land, situate in the state of New York, commonly called 'West Point,' as shall be by him judged requisite for the purpose of such fortifications and garrisons as may be necessary for the defense of the same." The executive has from time to time since purchased these lands, apparently solely under this authority. To find in this act, however, sanction for the proposition contended for by the demurrants, would be to hold that the very same congress (1st Cong. 1789–1791) which created the New York district provided that the lands at West Point might at any time thereafter by mere executive action, whether congress were in session or not, be taken out of the district, and left a no-man's land, wholly unprovided either with state or federal courts. There is nothing in the phraseology of the act of 1790 to warrant such a construction. Neither is there anything in the opinion in *Re Manufacturing Co.*, 108 U. S. 401, 2 Sup. Ct. Rep. 894, in conflict with the views above expressed. In all the instances of a shifting boundary therein referred to, there was a federal statute ratifying or approving the change. The assent of congress was given to the contract between New York and New Jersey by the act of June 28, 1843, (chapter 126, 4 St. at Large, 708.) The cession by Massachusetts to New York of the district of Boston Corner was consented to by the act of January 3, 1855, (chapter 20, 10 St. at Large, 602.) The conventional boundary line between Massachusetts and Rhode Island was sanctioned by the act of February 9, 1859, (chapter 28, 11 St. at Large, 382.) Each of these acts, when read in connection with the judiciary act of 1789, plainly imported that, when a state boundary was changed, lands theretofore assigned to one district were or were to be transferred to another. It was never pretended that any such change was effected by the mere operation of state statutes, and in the case at bar there is cited no federal statute which will bear such construction.

2. The contention of the demurrants that the pendency of the action in the state court brought by the trustees to foreclose the same mortgage is a bar to this suit is conclusively answered by a reference to *Stanton v. Embrey*, 93 U. S. 548; *Insurance Co.* v. *Brune's Assignee*, 96 U. S. 588; *Weaver* v. *Field*, 16 Fed. Rep. 22.

3. The demurrants next challenge the bill upon the theory that the complainant has not a standing in court for the purposes of this suit. The mortgage contains a clause providing that in case of default for the space of four months in the payment of interest the principal shall become due, and that the trustees may, and "upon the written request of the holders of a majority in amount of * * * outstanding bonds, shall * * * within a reasonable time, being not less than four months, proceed to foreclose the mortgage," etc. Acting upon such request, the trustees, in December, 1884, commenced a suit in the supreme court of the state, which was dismissed at special trial term, December, 1885, for

want of jurisdiction of the subject-matter.    An appeal was taken by the trustees, and is apparently unprosecuted, and certainly undetermined. Complainant therefore requested said trustees to bring suit in this court, which they declined to do.    The demurrants insist that complainant is not entitled to maintain this action unless it be shown that the trustees have refused to accede to a "written request of the holders of a majority of the bonds then outstanding."    Whether or not, as urged by the complainant, the bringing of a suit in a court without jurisdiction of the subject-matter is a failure to comply with the written request, need not be now considered.    There is no restriction in the deed of trust upon the right of the coupon holder, without assent of a majority of the bondholders, to foreclose for interest upon default, except when advantage is sought to be taken of that default as advancing the date when the principal becomes due.    This suit may in any event be sustained for interest due, (*Railroad Co.* v. *Fosdick*, 106 U. S. 47, 1 Sup. Ct. Rep. 10;) whether it can be sustained for principal may be determined upon the trial.

4. The objection that the bill is not filed on behalf of all other bondholders similarly situated is wholly unwarranted by an inspection of its terms.

5. The next proposition advanced in defendants' brief, namely, that the demurring defendants' claims to the property covered by the mortgage are independent and adverse, may be true in fact, but it certainly does not appear on the face of the bill.    To the Hudson River West Shore Railroad Company alone was the consent to build a railroad through the West Point reservation given by act of congress.    The court will not take judicial notice upon argument of a demurrer that $600,000 is not enough to build such railroad,—which is apparently what the demurrants' counsel expects it to do.    For all that appears, the road was substantially completed by the two original companies, and the complainant expressly avers that a large sum of money was expended by them in connection with the property which is averred to be covered by the mortgage. Across the West Point reservation there is now operated by the demurring defendants a railroad, which is so operated only by virtue of the act of congress above cited.    The only title to this which it is averred the New York Central & Hudson River Railroad Company has, is as lessee in possession of the defendant the West Shore Railroad Company.    The only title which it is averred the last-named defendant holds has come to it through many hands indeed, but ultimately from conveyances made by the mortgagors subsequent to the mortgage.    As owner of the equity, and as lessee in possession, the demurrants are proper parties defendant.

6. The demurrants next contend that complainant has slept so long upon his rights that by reason of lapse of time and his own laches he is not entitled to relief.    There is no pretense that the suit is barred by any statute of limitations.    If delay for any less period than that prescribed by the statute is sought to be availed of in bar of complainant's right to recover, the fact of such delay is a mixed question of law and fact, which should not be passed upon on demurrer.

7. It is further contended that the bonds on which complainant sues

are not valid obligations, for the reason that the "pretended West Shore Hudson River Railroad Company never was a corporation." That corporation was organized under the general railroad act (1850) of New York, "for the purpose of constructing, maintaining, and operating a railroad for the public use in the conveyance of persons and property, from a point in the boundary line between the states of New Jersey and New York on or near the west bank of the Hudson river, extending northwardly to the village of Piermont, in Rockland county, N. Y., and intersecting with the Erie Railroad and the southern terminus of the Hudson River West Shore Railroad; also commencing at the northern terminus of the aforesaid Hudson River West Shore Railroad, as the same had been, was, or might thereafter be, located at or near the city of Newburgh, Orange county, N. Y., and extending northerly along the west bank of the said Hudson river through the counties of Orange, Ulster, Columbia, and Greene, and terminating at Athens, in said county of Greene, state of New York." The quotation is from the bill, and, it is contended, indicates an undertaking to build two railroads, whereas the statutes only authorize the incorporation of a company to build a railroad. As a matter of fact, the routes southerly to the state line and northerly to Athens touch the respective south and north *termini* of the route of the Hudson River West Shore Railroad Company. Whether that circumstance, taken in connection with the general power to lease and make traffic arrangements, conferred upon all railroad corporations by the act of 1839, (chapter 218,) does or does not deprive the objection of force, need not be now considered. The validity of the incorporation has never been questioned in a direct proceeding by the state, nor by those interested in the corporation. It has acted continuously as a corporation; as such acquired the mortgaged premises, and created the mortgage debt; as such received the proceeds of these very bonds, and put them into the road covered by the mortgage. Objection to the validity of the corporation comes for the first time from these demurrants, the West Shore Railroad Company and the New York Central & Hudson River Railroad Company. The only claim, however, which, so far as the bill discloses, these demurrants advance to the mortgaged premises,—to the concession granted by congress to the Hudson River West Shore Railroad Company,—is based upon the transfer by the West Shore Hudson River Railroad Company to the New York, West Shore & Chicago Railroad on July 21, 1871. It does not lie in the mouths of these demurrants to dispute the existence of the corporation whose acts constitute their own sole source of title. If they have some independent and adverse claim, it is nowhere disclosed in the bill. See 2 Mor. Priv. Corp. § 746 *et seq.; Trust Co.* v. *Railway Co.*, 1 Railway & Corporation L. J. 50; *Society Perun* v. *Cleveland*, 43 Ohio. St. 481; *Palmer* v. *Lawrence*, 3 Sandf. 161; *Williamson* v. *Association*, 89 Ind. 389; *Railway Co.* v. *Railroad Co.*, 32 N. J. Eq. 755; *Church* v. *Pickett*, 19 N. Y. 482; *Whitney* v. *Wyman*, 101 U. S. 392; *Hervey* v. *Railway Co.*, 28 Fed. Rep. 169.

8. Finally, it is urged that the mortgage created no lien upon the property of the Hudson River West Shore Railroad Company. The

bonds to secure which the mortgage was executed were, as recited in the mortgage, bonds of the West Shore Hudson River Railroad Company, issued for the purpose of enabling the latter company to acquire a lease of the road and entire property and franchises of the former, and to build, furnish, and operate its own road. The demurrants contend that a railroad company has no power to mortgage its property to secure the debt of another company. Without discussing the precise question thus raised, it is sufficient to call attention to the fact that the mortgage is a joint one executed by both roads, and covers "all and singular the railways of the parties of the first part hereto, constructed or hereafter to be constructed, [between the state line and Newburgh,] and also all and singular the franchises now owned, possessed, or acquired by the said parties of the first part, or either of them, for the purpose of building, maintaining, and operating their respective lines of railway," etc. Either prior or subsequent to the mortgage—the phraseology of the bill does not leave the date altogether certain—the Hudson River West Shore Railroad Company leased its road for the entire term of its corporate existence to the West Shore Hudson River Railroad Company, and its entire capital stock was transferred to the latter company. The right of the West Shore Hudson River Railroad Company to mortgage its own property to secure its own bonds is not disputed; and, even if the lease and transfer of stock were not made until after the mortgage, they would be covered by it as after-acquired property, unless such lease and transfer were void. That they were void these demurrants contend, but their own title depends upon the validity of these very transfers. The concession of congress was to the Hudson River West Shore Railroad Company. Nothing is shown qualifying the title of that corporation to this concession, except the mortgage, the lease, and the transfer. The two last instruments are operative, if at all, in favor of the West Shore Hudson River Railroad Company; and nothing is shown qualifying the title of the latter company to the property thus sought to be transferred except this mortgage, and the transfer of July 27, 1871, to the New York, West Shore & Chicago Railroad Company, discussed under the last point, and under which the demurrants claim. They are, therefore, in no position to dispute the sufficiency of the lease and transfer of capital stock. There is no force in their argument that, if they "are to be considered as succeeding to the property and rights of the Hudson River West Shore Railroad Company, they can of course question the validity of the mortgage, if its validity could have been questioned by the corporation itself," because the very instruments which make them successors to the property and rights of the Hudson River West Shore Railroad Company also operate to make the mortgage valid. If these rights were passed to the West Shore Hudson River Railroad Company, and thence to demurrants' grantor, they were covered by the mortgage, which was in existence, and operative to cover after-acquired property, before the West Shore Hudson River Railroad Company passed them on.

The demurrer of the defendants the West Shore Railroad Company and the New York Central & Hudson River Railroad Company is overruled, with leave to answer.