UNITED STATES v. PEUSCHEL et al.

(District Court, S. D. California. N. D. April 28, 1902.)

No. 36.

1. JURY IN CRIMINAL CASES—NATURE AND CONSTITUTION—SIXTH CONSTITUTIONAL AMENDMENT.

The sixth constitutional amendment, which provides that "in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law," does not give an accused the right to be tried by a jury composed of persons representing every locality in the district, but secures to him only the right to a trial by a jury, every member of which is a resident of the territory which comprised the district at the time the offense is alleged to have been committed.

¶ 1. See Jury, vol. 31, Cent. Dig. §§ 8, 229.

**2. SAME—EFFECT OF CHANGE IN BOUNDARY OF DISTRICT.**
By Act May 29, 1900 (31 Stat. 219), three counties in California were transferred from the Northern to the Southern federal judicial district of that state. The act provides that all offenses committed within the territory transferred prior to its passage "shall be prosecuted, tried and determined in the same manner, and with the same effect to all intents and purposes as if this act had not been passed." *Held*, that the change in boundary did not affect the legal identity of the existing districts which had been "previously ascertained by law" within the meaning of the sixth constitutional amendment, nor did the act affect the jurisdiction of the courts in either district to try persons charged with having previously committed crimes in such district, outside of the counties transferred, whose rights under such amendment could be fully protected by excluding from the jury impaneled any person called who was not a resident of the district as it existed prior to the change in its boundary.

**3. CONSPIRACY—FRAUDULENT ENTRY OF LANDS—DEMURRER TO INDICTMENT.**
The objection that it is within the exclusive jurisdiction of the land department to determine questions of fact involved in the trial of an indictment for conspiracy to defraud the United States by an illegal entry of public lands cannot be raised by demurrer, where the indictment does not show that any proceeding relating to such entry is pending in the department.

**4. SAME—SUFFICIENCY OF INDICTMENT—WORDS OF REFERENCE AS TO TIME.**
To constitute a criminal conspiracy to defraud the United States by obtaining title and possession, through homestead entry, to mineral lands not subject to entry, the fact that the land contained valuable minerals, and knowledge of such fact by the conspirators at the time the conspiracy was formed, are essential, and must be averred in the indictment. An indictment which, after charging such conspiracy and the subsequent making of an affidavit, and the filing of an application for entry in furtherance thereof, avers that the defendants "then and there" well knew that the land contained valuable mineral deposits, is uncertain, and fatally defective, in failing to charge such knowledge at the time the conspiracy was formed.

**5. SAME—AVERMENT OF ESSENTIAL FACTS.**
An averment in such indictment that defendants then and there well knew that the land contained valuable mineral deposits is not sufficient as an averment of the fact of such deposits, which must be alleged directly and positively.

**6. SAME—TO DEFRAUD GOVERNMENT.**
Persons may be guilty of conspiracy to defraud the United States by obtaining title to public mineral lands by means of a homestead entry, since a patent to such lands so obtained would not be void.

Criminal Prosecution. On demurrer to indictment.

L. H. Valentine, U. S. Atty.

Hannah & Miller and W. D. Crichton, for defendants.

WELLBORN, District Judge. Prosecution for conspiracy to defraud the government of the title to and possession of certain lands therein described. The indictment alleges that defendants, on the 6th day of June, 1899, conspired to defraud the United States of the title and possession of said lands "by means of false, feigned, and illegal entries of said lands under the homestead laws of the said United States, the said lands being then and there public lands of the United States, and appearing on the books of the United States land office at the city of Visalia, county of Tulare, within said division of said district, as subject to entry and settlement, but were then and

there in truth and in fact mineral lands, and not subject to entry or settlement; which fact was then and there well known to said Edward A. Peuschel, Frederick G. Maid," etc. It is then alleged that in pursuance of said conspiracy, on the 7th day of June, 1899, the defendant Maid filed in the land office at the city of Visalia, in the said county of Tulare, his written application to enter said land, and that at the time of filing said application, and as a part of the same transaction, he filed a nonmineral affidavit, and that said lands "were then and there public lands of the United States, and appeared upon the books of the said United States land office at said city of Visalia as subject to entry and settlement; but said lands were then and there in truth and in fact mineral lands not subject to entry and settlement under the homestead laws of the United States,—all of which was then and there well known to said Edward A. Peuschel, Frederick G. Maid," etc. The indictment then alleges that said affidavit was made on the 6th day of June, 1899, by said Maid, in pursuance of said conspiracy, and states the substance of the same, and continues as follows:

"The said Edward A. Peuschel and said Frederick G. Maid, and said others to the grand jurors unknown, then and there well knowing that said lands referred to in said affidavit, and for which application to enter was made by said Frederick G. Maid, were then and there mineral lands, and not subject to entry or settlement under the homestead laws of the United States, and that there were then and there within the limits of said lands valuable mineral deposits," etc.

The counties of Kern and Tulare, in which the conspiracy was formed and overt act committed, have been within the Southern district of California ever since it was organized. On the 29th day of May, 1900, an act of congress was passed, which went into effect June 30th thereafter, transferring to said district from the Northern district of California the three counties of Merced, Mariposa, and Inyo. 31 Stat. 219. The objections urged against the indictment are as follows: First. That the sixth amendment to the constitution of the United States provides that "in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law," and that because of the above-mentioned transfer of counties a jury for the trial of the defendants, such as said amendment guaranties, cannot be had, and therefore the prosecution should be discontinued. Second. That the question of the right of defendant Maid to perfect the homestead entry mentioned in the indictment is pending before the land department, and that said department has exclusive jurisdiction to determine some of the matters here involved, namely, the character of the land and the bona fides of the entry. Third. That the indictment does not allege as a fact that the lands contained any known mines or valuable mineral deposits. Fourth. That if the lands, by reason of known mines or valuable mineral deposits therein, were not subject to homestead entry, neither the alleged entry nor a patent issued thereon could in any manner affect the title to or possession of said lands. These objections will be considered in the order of their statement.

1. The phraseology of the act of congress above mentioned, transferring to this district the three counties named, admits of no dispute as to the intention of congress in its passage. The title is as follows:

"An act to detach certain counties from the United States judicial district of northern California and to annex such counties to the United States judicial district of southern California; to divide said Southern district of California into two divisions and to provide for the holding of terms of court at the city of Fresno and city of Los Angeles."

In furtherance of one of the objects thus declared, the first section of the act is as follows:

"Be it enacted by the senate and house of representatives of the United States of America in congress assembled, that all that portion of the state of California now comprised in the counties of Inyo, Mariposa, and Merced is hereby detached from the United States judicial district of northern California, known as the Northern district of California, and annexed to and made a part of the United States judicial district of southern California, known as the Southern district of California."

It will be observed that said act, both in title and enacting clause, expressly recognizes the continuation of the then existing districts, one known as the Northern and the other as the Southern district of California, and that the only change the act makes or purports to make in the two districts is to take from the Northern and add to the Southern district an inconsiderable amount of territory, leaving both districts the same in all other respects,—in name, in jurisdiction, in personnel of the courts, etc. Many similar statutes, with similar results, affecting various districts, and sometimes circuits, throughout the United States, have been enacted at different times by congress, and there is no principle upon which such legislation has more uniformly proceeded than that changes in the boundaries of districts and circuits do not affect their identity in law. Counsel for defendants, however, contend that the sixth amendment to the constitution guaranties to an accused person the right to trial by a jury drawn from the citizenry eligible to jury service within the district where the offense was committed at the time of its commission, and that any subsequent increase or decrease of such citizenry by a change in the boundaries of the district, unless the act making the change expressly saves from its operation past offenses, renders a constitutional jury or trial impossible, and that an indictment found under such circumstances is ineffectual, and should, therefore, be set aside by the court. Congress, in the passage of said act of May 29, 1900, above mentioned, took—and rightfully, as I shall show later on—a different view of said amendment, which amendment unquestionably was then present and prominent in the legislative mind. Section 5 of said act provides, among other things:

"That all offenses committed in that portion of the Northern district of California hereby detached therefrom and prior to the passage of this act shall be prosecuted, tried, and determined in the same manner and with the same effect to all intents and purposes as if this act had not been passed."

This provision, which, in effect, so far as past offenses are concerned, retains within the Northern district the territory otherwise detached therefrom, was incorporated in the act for the sole purpose

of avoiding any failure in the execution of criminal laws in said territory through the operation of the sixth amendment. Now, if congress had for a moment supposed that by making such a transfer of territory it was so changing the districts as that neither of them, with reference to any of the other counties, could thereafter be said, within the meaning of said sixth amendment, to have been "previously ascertained," it would, instead of limiting said provision to offenses committed in the three counties transferred, have extended it to all offenses committed prior to the passage of the act in all the counties of both districts. The fact that said provision was not so extended shows conclusively that in the opinion of congress the transfer of the three counties from one district to the other could not affect prosecutions for offenses theretofore committed, except such as were committed in the transferred counties. This construction of the sixth amendment, upon which congress obviously acted, is clearly the only admissible one. The manifest object of said amendment is to preserve to a person charged with crime such a jury as he was entitled, at the time of its commission, to demand. Now, a defendant in a criminal case cannot require that a jury for his trial shall be made up of persons coming from every neighborhood in the district, but only that all the jurors shall be residents of the district. U. S. v. Ayres (D. C.) 46 Fed. 651; U. S. v. Wan Lee (D. C.) 44 Fed. 707. In the latter case, Judge Hanford says:

"All that the defendant can claim as a constitutional right is to have a jury of the district try his case; that is, a jury every member of which resides within the district. He has no right to insist that every part of the district shall be represented in the make-up of the jury by residents of each place and locality. That would be impossible in any case."

There is not now, nor has there ever been, any federal statute requiring either a grand or petit jury to be composed of persons representing every locality in the district. On the contrary, it is expressly provided:

"Jurors shall be returned from such parts of the district, from time to time, as the court shall direct, so as to be most favorable to an impartial trial, and so as not to incur an unnecessary expense or unduly to burden the citizens of any part of the district with such services." Rev. St. U. S. § 802.

This statute is almost as old as the government, having been a part of the judiciary act of 1789; and, the courts having acted upon it uninterruptedly for more than a hundred years, its constitutionality cannot now be successfully challenged. U. S. v. Ayres, supra; U. S. v. Wan Lee, supra; U. S. v. Chaires (C. C.) 40 Fed. 820.

The plain and incurable vice of defendants' argument is its assumption that a defendant is entitled to a jury summoned from every part of the district. To obtain a jury of that sort, as said in U. S. v. Wan Lee, supra, "would be impossible in any case," and a result so manifestly unattainable was never contemplated by the sixth amendment, or any legislation of congress. The only constitutional right of the defendant is to a jury of which every member is a resident of a county or locality which, at the time the offense is alleged to have been committed, was a part of the district. To illustrate, if the defendants were brought to trial on this indictment, and while the jury was being im-

paneled it should be developed that any of the proposed jurors were residents of either of the three counties transferred from the Northern to the Southern district by the act of May 29, 1900, it would be a ground of challenge to such jurors, under the sixth amendment, that the county of which they are residents was not, at the time of the alleged commission of the offense, a part of the district. This, or similar procedure, would secure to the defendants every right, which the sixth amendment was intended to guaranty. If, however, defendants' contention were to prevail, it would relieve from punishment all persons who have committed crimes against federal statutes in California prior to June 30, 1900, and for which prosecutions had not then been commenced. Such a mischievous result should not be accomplished by a strained and tortured construction of the sixth amendment, when a fair and reasonable construction avoids the mischief, and at the same time effectuates the object of the amendment. U. S. v. Maxon, 5 Blatchf. 360, 26 Fed. Cas. 1,220, does not bear upon the point now under consideration. In that case the district in which the indictment was found was unquestionably a different district from the one in which the offense was committed. The government contended, however, that the word "previously," in the sixth amendment, referred to the time of the trial, not the commission of the offense, and the unsoundness of this contention was the only thing decided by the court. In U. S. v. Dawson, 15 How. 467, 14 L. Ed. 775, the court held the sixth amendment inapplicable, and the question here involved was not considered.

2. The objection that the land department has exclusive jurisdiction to determine some of the matters essential to the crime charged cannot be raised by demurrer, for the reason that it does not appear that Maid's homestead application is now, or was when the indictment was found, pending in the land department.

3. The supreme court of the United States has said:

"It is plain, from this brief statement of the legislation of congress, that no title from the United States to land known at the time of sale to be valuable for its minerals of gold, silver, cinnibar, or copper can be obtained under the pre-emption or homestead laws or the town-site laws, or in any other way than as prescribed by the laws specially authorizing the sale of such lands, except in the states of Michigan, Wisconsin, Minnesota, Missouri, and Kansas. We say 'land known at the time to be valuable for its minerals,' as there are vast tracts of public land in which minerals of different kinds are found, but not in such quantity as to justify expenditures in the effort to extract them. It is not to such lands that the term 'mineral' in the sense of the statute is applicable. In the first section of the act of 1866 no designation is given of the character of mineral lands which are free and open to exploration. But in the act of 1872, which repealed that section, and re-enacted one of broader import, it is 'valuable mineral deposits' which are declared to be free and open to exploration and purchase. The same term is carried into the Revised Statutes. It is there enacted that 'lands valuable for minerals' shall be reserved from sale, except as otherwise expressly directed, and that 'valuable mineral deposits' in lands belonging to the United States shall be free and open to exploration and purchase. We also say lands 'known at the time of their sale to be valuable,' in order to avoid any possible conclusion against the validity of titles which may be issued for other kinds of land, in which years afterwards rich deposits of mineral may be discovered. It is quite possible that lands settled upon as suitable only for agricultural purposes, entered by the settler and patented

by the government under the pre-emption laws, may be found, years after the patent has been issued, to contain valuable minerals. Indeed, this has often happened. We therefore use the term 'known to be valuable at the time of sale,' to prevent any doubt being cast upon titles to lands afterwards found to be different in their mineral character from what was supposed when the entry of them was made and the patent issued." Deffeback v. Hawke, 115 U. S. 392, 6 Sup. Ct. 95, 29 L. Ed. 426.

Thus it will be seen that one element of the crime sought to be charged is that defendant's knew said land to be valuable for its minerals, and this knowledge must, of course, have been had at the time the conspiracy was formed. An allegation of such knowledge at any subsequent time, however brief the interval,—for instance when the homestead application was filed, or the affidavit sworn to,—is insufficient. The clause in the indictment which most nearly fulfills the above-mentioned requirement is the one last quoted, namely: "The said Edward A. Peuschel and said Frederick G. Maid * * * then and there well knowing * * * that there were then and there within the limits of said land valuable mineral deposits." It is impossible to determine, however, from the words of reference used, whether the defendants had the knowledge imputed to them of the character of the lands at the time the conspiracy was formed, or at the time said affidavit was sworn to, or at the time said homestead application was filed; and this is fatal to the indictment. The rule on this subject has been thus declared:

"Words of Reference—'Then and There.' When time is once mentioned in any part of the information or indictment, it may be subsequently laid as the time of the commission of the offense by words of reference, as 'then and there,' with the same effect as if it were actually repeated; and likewise where the time is laid in one count it may be laid in subsequent counts by such words of reference; but such a reference is not sufficient where more than one time is laid in the part of the pleading referred to by the words, because it would not appear to which time such words applied." 10 Enc. Pl. & Prac. p. 519; Jane v. State, 3 Mo. 61; State v. Hayes, 24 Mo. 358; Com. v. Moore, 11 Cush. 600; State v. Day, 74 Me. 220.

In Jane v. State, supra, the court says:

"It is clear law, and has been so adjudged by this court (State v. Hardwick, 2 Mo. 228), that, if the facts be stated as to time or place with repugnancy or uncertainty, the indictment will be bad; and if two times or places have been previously mentioned, and afterwards a part is only laid 'then and there,' the indictment is defective, because it is uncertain to which it refers; and it is no answer to the objection to say that 'then and there' will refer grammatically to the last antecedent, time and place."

If, however, in the case at bar, it were held that "then and there" refer to the last antecedent time and place, the time thus fixed would be the time of the making of the affidavit, which affidavit the indictment charges was in furtherance of, and therefore must have been made subsequent to, the conspiracy; so that, under this construction, the averment would be defective. Furthermore, the allegation in question, even were it certain as to date, is defective for lack of directness of statement. As I have just shown, one of the constituents of the crime sought to be charged is that the land contains valuable minerals. The allegation is as follows: "The said Edward A. Peuschel and said Frederick G. Maid * * * well

knowing * * * that there were * * * within the limits of said lands valuable mineral deposits." This allegation asserts expressly a mental condition of the defendants, but only indirectly, and by way of inference, the mineral quality of the land, and for that reason is insufficient under the authorities below cited. U. S. v. Smith (D. C.) 45 Fed. 561; U. S. v. Harris (D. C.) 68 Fed. 347; U. S. v. Long, Id 348. In the last-named case, the court says:

"The requirement is elementary that an indictment should allege with directness all the constituents of the crime it purports to charge. On this subject the supreme court of the United States has spoken in emphatic and unequivocal language, as shown by the following quotation: 'The general, and, with few exceptions, of which the present case is not one, the universal rule on this subject, is that all the material facts and circumstances embraced in the definition of the offense must be stated, or the indictment will be defective. No essential element of the crime can be omitted without destroying the whole pleading. The omission cannot be supplied by intendment or implication, and the charge must be made directly, and not inferentially, or by way of recital.' U. S. v. Hess, 124 U. S. 486, 8 Sup. Ct. 571, 31 L. Ed. 516."

4. Defendants' contention that, conceding the mineral quality of the land to be sufficiently alleged, any patent that might be issued on the homestead entry of the defendant Maid would be void, and therefore the government could not possibly be defrauded, is unsound in its main premise, and therefore wrong in its conclusion. In the case supposed the patent would not be void, but good against collateral attack. In the case cited by defendants, the court says:

"Land. the title to which has passed from the United States before the claim on which the patent is based was initiated, land reserved from sale and disposition for military or other like purposes, land reserved by a claim under a Mexican or Spanish grant sub judice, and land for the disposition of which congress made no provision, is not intrusted to the disposition of the land department, is not within its jurisdiction, and hence its patents for such land are void on their face, and may be collaterally attacked in an action at law. * * * But land which the department is vested with the power and charged with the duty to hear and decide the claims of applicants for, and to dispose of in accordance with its decision, is within its jurisdiction, and its patent of such land conveys the legal title to it, and is impervious to collateral attack, whether its decision is right or wrong." King v. McAndrews, 50 C. C. A. 31, 111 Fed. 863.

The first, second, and fourth objections are untenable. The third is well taken. On that ground the demurrer will be sustained.