SEADLUND v. UNITED STATES.

No. 6613.

Circuit Court of Appeals, Seventh Circuit.

June 16, 1938.

Floyd E. Thompson and Frederic Burnham, both of Chicago, Ill., for appellant.

Michael L. Igoe, U. S. Atty., and Martin Ward, Asst. U. S. Atty., both of Chicago, Ill.

Before MAJOR and TREANOR, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This is an appeal from a judgment entered March 19, 1938, upon defendant's

744

plea of guilty, sentencing him to death upon the recommendation of a jury called by the court to determine whether defendant should suffer such penalty.

The indictment charged the defendant with kidnaping for ransom, Charles S. Ross, and transporting him in interstate commerce over land by means of an automobile in violation of Section 408a, Title 18, U.S.C.A.[1]

The transportation alleged was from Franklin Park, Illinois, to Emily, Minnesota, and from Emily, Minnesota, to Spooner, Wisconsin, at which latter place, on, to-wit: October 10, 1937, Charles S. Ross was killed by defendant. The second count alleged that defendant was aided and assisted in transporting Ross by James Atwood Gray.

On September 25, 1937, Charles S. Ross, in company with Miss Florence Freihage, his private secretary, was traveling by auto toward Chicago via State Highway 64, when, at the intersection of Wolf Road, the defendant approached the automobile, robbed Florence Freihage, seized Charles S. Ross and forced him to enter defendant's automobile. James Atwood Gray accompanied the defendant, and together they transported Ross to Emily, Minnesota, near where they held him a captive.

Negotiations were shortly instituted between defendant and representatives of Mrs. Ross, the wife of Charles S. Ross, concerning a ransom which was demanded by the defendant for the release of Ross. Such negotiations culminated in an agreement by which defendant was to receive $50,000 in currency. Following defendant's suggestions as to the manner, time and place, the ransom money on October 8, 1937, was delivered by a representative of Mrs. Ross at a point on the highway near Rockford, Illinois, where it was received by the defendant. The money thus paid as ransom was taken by the defendant to Emily, Minnesota, and the following day, defendant, Gray, and Ross went by automobile from Emily, Minnesota to a point approximately seventeen miles north of Spooner, Wisconsin. There accompanied the ransom money, a letter of instructions. According to defendant's version, this letter was lost and he and Gray were in doubt as to the manner in which the release of Ross should be effected. It was testified by the defendant that they were willing to release Ross any time and place satisfactory to him, provided it was at some point where he could not call the police. It was also testified by the defendant that he and Gray had stored gasoline in a dugout in the vicinity of Spooner, Wisconsin, where they went to obtain sufficient gasoline to make a trip to Lake Geneva, where Ross was to be released; that a controversy arose between defendant and Gray near the opening of the dugout; that Gray struck defendant with the butt of a gun; that defendant grabbed the revolver and that during the struggle, defendant shot Gray in the chest and that all three of them fell into the hole, where the struggle continued. It was defendant's version that Ross received an injury to his head as he fell on the floor of the dugout. Both Gray and Ross were severely injured, and after deciding that both were unconscious, if not dead, and to end their suffering and avoid the possibility that they might be left to die in agony, defendant shot both Gray and Ross. Their bodies were left in the dugout, the lid of which was covered with dirt.

Defendant buried in the ground near Walker, Minnesota, $32,645 of the ransom money, and retained the balance in his possession. He then traveled by auto-

[1] "§ 408a. Kidnaped persons; transportation, etc., of persons unlawfully detained.

"Whoever shall knowingly transport or cause to be transported, or aid or abet in transporting, in interstate or foreign commerce, any person who shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away by any means whatsoever and held for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall, upon conviction, be punished (1) by death if the verdict of the jury shall so recommend, provided that the sentence of death shall not be imposed by the court if, prior to its imposition, the kidnaped person has been liberated unharmed, or (2) if the death penalty shall not apply nor be imposed the convicted person shall be punished by imprisonment in the penitentiary for such term of years as the court in its discretion shall determine: Provided, That the failure to release such person within seven days after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away shall create a presumption that such person has been transported in interstate or foreign commerce, but such presumption shall not be conclusive. (June 22, 1932, c. 271, § 1, 47 Stat. 326, as amended May 18, 1934, c. 301, 48 Stat. 781)."

mobile to various parts of the country. In January, 1938, he was arrested at the Santa Anita Race Track, Los Angeles, California. In the hotel room occupied by him, a large sum of the ransom money was found, as well as $900 in a pocketbook carried on his person. The money buried by the defendant at Walker, Minnesota, together with that found in his room and upon his person was identified as that delivered to him October 8, 1937, on the highway near Rockford, Illinois.

After defendant's arrest, he made a written confession, relating the story of his activities in the seizing, transporting and holding of Ross. Subsequently, in company with Government agents, he pointed out the place where Ross was held while the ransom negotiations were in progress, and also where the money was buried near Walker, Minnesota. He also divulged to officers, the dugout which contained the bodies of Ross and Gray. A post mortem examination revealed that Ross had two fractures of the skull which almost completely encircled his head, several fractures of the ribs and a wound where a bullet had entered the head at a point approximately back of the ear.

The errors assigned arise out of the defendant's contention that the statute in question is unconstitutional; that in view of defendant's plea of guilty, the court, not the jury, should have passed upon the question of punishment; that the indictment should have been quashed; that the grand jury and petit jury were improperly summoned; that the petit jury were improperly selected; that the court erred in certain rulings on evidence; that defendant's motion for new trial and defendant's motion in arrest of judgment should have been granted.

Counsel for defendant urge upon us with an earnestness which cannot be doubted that Congress, in enacting the statute in question, acted beyond its authority and that the same is therefore unconstitutional. It must be conceded, we think, that if the authority exists for such legislation, it must be by reason of the Commerce Clause of the Constitution. U.S.C.A.Const. § 1, § 8, cl. 3. The extent which Congress is authorized to legislate under this clause has been a continual source of controversy almost from the beginning of the republic down to the present day. The Supreme Court has, on many occasions, dealt with the power thus conferred, and yet it is not susceptible of exact definition. As was said by the Court in Carter v. Carter Coal Company, 298 U.S. 238, 56 S.Ct. 855, 80 L. Ed. 1160, in answering its own inquiry, "What is commerce?", page 297, 56 S.Ct. page 867: "The term, as this court many times has said, is one of extensive import. No all-embracing definition has ever been formulated. The question is to be approached both affirmatively and negatively —that is to say, from the points of view as to what it includes and what it excludes." That this situation exists, we think, is due to the fact that what the court has said on so many different occasions, must be considered in light of the particular circumstances confronting the court in connection with the language used and statements made. This has produced an apparent conflict in authorities difficult to reconcile.

It is urged upon us that the pronouncement of the court in construing the Commerce Clause in cases such as Carter v. Carter Coal Company, supra; Adair v. U. S., 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436, 13 Ann.Cas. 764; U. S. v. E. C. Knight Co., 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325, and Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724, when applied to the instant statute demonstrate its invalidity. Even though we were possessed of the ability, which we disclaim, of analyzing the opinions of the court in these cases, as well as others called to our attention, and distinguishing them from cases which apparently sustain its validity, we could accomplish little, if anything, by so doing. In general, it may be said that the court was dealing with situations quite dissimilar to that which here confronts us. That which is within the sphere of Congressional authority, covers such a wide field of activities that we think it more logical to apply what the Supreme Court has said in cases where the court was presented with circumstances more similar to those here.

Defendant's argument that the act is unconstitutional, it seems to us, is almost if not entirely shattered by the opinion of the court in Brooks v. U. S., 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407. There, the court was considering the validity of the National Motor Vehicle Theft Act, 18 U.S.C.A. 408, which among other things penalized a person who transported in interstate commerce, a motor vehicle,

knowing the same to have been stolen. The court on page 436, 45 S.Ct. on page 346, said:

"Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such commerce as an agency to promote immorality, dishonesty or the spread of any evil or harm to the people of other states from the state of origin. In doing this it is merely exercising the police power, for the benefit of the public, within the field of interstate commerce."

Then follows a review of cases sustaining the validity of such enactments as that which excludes from interstate commerce, dead stock, Reid v. Colorado, 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108; the transmission of lottery tickets from one state to another, calculated to demoralize the people in other states through a spread of the gambling habit, Lottery Case, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492; the penalizing of the transportation in interstate commerce of adulterated articles calculated to deceive or injure persons who might purchase the same, Hipolite Egg Co. v. U. S., 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364; the so-called White Slave Traffic Act, 18 U.S.C.A. §§ 397–404, penalizing any person engaged in enticing a woman from one state to another for immoral purposes, Hoke v. U. S., 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523, 43 L.R.A.,N.S., 906, Ann.Cas. 1913E, 905 and Caminetti v. U. S., 242 U. S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A. 1917F, 502, Ann.Cas.1917B, 1168; the prohibition of the shipment of intoxicating liquors into any state in which their use was prohibited, Clark Distilling Co. v. Western Maryland Railway Co., 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326, L.R.A.1917 B, 1218, Ann.Cas.1917B, 845; the prohibition of the importation of prize fight pictures because of the demoralizing effect which such pictures might have on the people of the state of destination, Weber v. Freed, 239 U.S. 325, 36 S.Ct. 131, 60 L. Ed. 308, Ann.Cas.1916C, 317. On page 438, 45 S.Ct. on page 346, the court distinguishes the case of Hammer v. Dagenhart, supra, wherein the act there considered was held invalid because "it was really not a regulation of interstate commerce but a congressional attempt to regulate labor in the state of origin by an embargo on its external trade." In Hoke v. U. S., supra, the court had under consideration the validity of "The White Slave Traffic Act," and on page 323, 33 S.Ct. on page 284, said:

"The principle established by the cases is the simple one, when rid of confusing and distracting considerations, that Congress has power over transportation 'among the several states;' that the power is complete in itself, and that Congress, as an incident to it, may adopt not only means necessary but convenient to its exercise, and the means may have the quality of police regulations."

In Caminetti v. United States, supra, the court on page 491, 37 S.Ct. on page 197, used this pertinent language:

"The transportation of passengers in interstate commerce, it has long been settled, is within the regulatory power of Congress, under the commerce clause of the Constitution, and the authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question."

In the recent case of Kentucky Whip & Collar Co. v. Illinois Cent. R. Co., 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270, the court had under consideration the validity of a Congressional enactment making it unlawful knowingly to transport in interstate or foreign commerce, goods made by convict labor, etc. In discussing the authority of Congress, it is said on page 347, 57 S.Ct. on page 281:

"And, while the power to regulate interstate commerce resides in the Congress, which must determine its own policy, the Congress may shape that policy in the light of the fact that the transportation in interstate commerce, if permitted, would aid in the frustration of valid state laws for the protection of persons and property. Brooks v. United States, supra; Gooch v. United States, 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522."

The court in this case also said, page 348, 57 S.Ct. page 281: "Similarly, the object of the Federal Kidnaping Act [18 U. S.C.A. §§ 408a–408c] is to aid in the protection of the personal liberty of one who has been unlawfully seized or carried away." It is claimed this language is obiter dictum and should be so treated. If such be conceded, yet we regard it as a rather persuasive statement and certainly at least represents the view of the author of the opinion.

In view of what the Supreme Court has held, in construing the commerce clause under circumstances not dissimilar to those here, we are convinced that the act before

us is a valid enactment. If Congress, under its authority to "regulate commerce," may penalize one who transports in interstate commerce, a stolen motor vehicle, or may prohibit the transportation from state to state of women for immoral purposes, as the Supreme Court has said it may do, we are unable, by any process of reasoning at our command, to discern why Congress may not likewise penalize the transportation of a person who has been kidnaped and held for ransom. In the first case property rights are sought to be protected—in the second, the morals of the community, and in the instant case, liberty and perhaps life itself.

■ Defendant, by appropriate plea in abatement, preserves for review, three questions which are assigned as error, namely: (1) that the grand jury which returned the indictment and the petit jury which recommended the death penalty, were selected from the Eastern Division of the Northern District of Illinois, which it is claimed is in violation of Amendment 6 to the Constitution U.S.C.A. Const. Amend. 6 which provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which District shall have been previously ascertained by law." We do not understand that this provision requires that the jury be summoned from the entire district. Its language does not so indicate. It requires a jury of the District. It means, we think, nothing more than that the jury can not be selected from without or beyond the District. This view is sustained in Marvel v. Zerbst, 10 Cir., 83 F. 2d 974, U. S. v. Peuschel, D.C., 116 F. 642, 646, and U. S. v. Ayres, D.C., 46 F. 651, 652. Congress has evidently placed this interpretation upon the provision in view of 28 U.S.C.A. § 413, which reads as follows:

"Jurors shall be returned from such parts of the district, from time to time, as the court shall direct, so as to be most favorable to an impartial trial, and so as not to incur an unnecessary expense, or unduly burden the citizens of any part of the district with such service."

(2) Error is alleged in that the jurors were summoned by mail. Section 416, Title 28, U.S.C.A., provides: "Any person named in such writ by direction of the court may be served by the marshal mailing a copy thereof to such person." It appears, however, there was no such direction on the part of the court. In U. S. v. Morse et al., D.C., 292 F. 273, the court in discussing a similar question, on page 279 said: "The provision of the statute in this regard is directory, and not mandatory, and no prejudice is shown by failure to summon the jurors in the exact mode set forth in the statute. Breese v. U. S., 203 F. 824, 122 C.C.A. 142; United States v. Ambrose (C. C.) 3 F. 283."

■ Our attention is called to no authority sustaining defendant's position and we are of the opinion the error, if such it be, could have had no harmful effect. It is also claimed that the grand jury which returned the indictment was not composed of twenty-three persons drawn from the jury box by the Clerk and the Jury Commissioner, as the law provides. Ill.Rev.Stat. 1937, c. 78, § 9. The circumstances with reference to the selection of the grand jury are almost identical with those related in People v. Lieber, 357 Ill. 423, 192 N.E. 331, wherein the court on page 437, 192 N.E. on page 337, said:

"We think it is well settled by our own decisions and by two different sections of our statutes that a substantial compliance with the law providing for the drawing and impaneling of a grand jury is all that is required unless the record shows improper influence, undue prejudice, or other matters which might have caused a true bill to be improperly returned."

■ No such situation is here disclosed.

■ (3) Error is also assigned that the writ of venire facias, by virtue of which the jurors were summoned, was void because it did not bear teste of the Chief Justice of the United States. The writ was attested by District Judge James H. Wilkerson, the Senior Judge of the District, and we think it is in compliance with Section 721, Title 28, U.S.C.A.

■ The denial by the trial court of the request of defendant's counsel to examine the petit jurors on their voir dire, is urged as error. It is said that this amounts to a denial of the Constitutional right of the defendant to have the assistance of counsel in his defense. U.S.C.A. Const. Amend. 6. This precise question was passed upon by this court in Paschen v. U. S., 7 Cir., 70 F.2d 491, contrary to defendant's contention. We agree with the conclusion there reached.

748

It is urged that the court acted without authority in submitting to a petit jury, after a plea of guilty, the following question: "Do you, the jury, recommend that the defendant, John Henry Seadlund, alias Peter Anders, be punished by death? Answer 'Yes' or 'No.' Answer ————." So far as we are aware, this question has not been passed upon by any Appellate Tribunal. It is defendant's position that such authority must be found in the Statute, or it does not' exist. It is argued that no such authority is therein found and that this interpretation is strengthened by the fact that the Supreme Court, in its rules promulgated pursuant to the provision of the Act of March 8, 1934, 28 U.S.C.A. § 723a, makes no such provision after a plea of guilty. The rule authorizes the court upon a plea of guilty before sentence "if the conditions or the character of the defendant or other pertinent matters should be investigated in the interests of justice" to conduct an investigation. The Government contends that in addition to the authority contained in the Statute, the portion of the rule just quoted is sufficient to authorize such submission. We do not believe that the rules of court either detract from or add to the language of the statute with reference to this question. In other words, it seems to us that the authority, if it exists, must be found in the statute itself. The Act in question ,was originally enacted June 22, 1932, 47 Stat. 326, and was amended May 18, 1934 in its present form. 18 U.S.C.A. §§ 408a–408c. The punishment provided in the original Act was by "imprisonment in the penitentiary for such term of years as the court, in its discretion, shall determine." It is readily apparent from this language as found in the original act that either upon a finding of guilt by a jury, or a plea of guilty, the punishment was solely a matter in the discretion of the court. Among the amendments contained in the present act is that regarding punishment which is first "by death if the verdict of the jury shall so recommend * * *" second, "if the death penalty shall not apply nor be imposed, the convicted person shall be punished by imprisonment in the penitentiary for such term of years as the court in its discretion shall determine." It is contended by defendant that a plea of guilty precludes the imposition of the death penalty and that the language authorizes such penalty only upon a plea of not guilty. We are unable to so read the statute. The language employed, it seems to us, is plain and its meaning free from doubt. Congress, unquestionably, intended to place a limitation upon the right of the court to impose the death penalty in that before so doing, an affirmative recommendation must be made by a jury. Upon a plea of not guilty, in addition to the issue as to the defendant's guilt, there may be submitted the further question, in case the jury finds him guilty, as to whether the jury recommend the death penalty. On a plea of guilty, it is discretionary with the court to punish by imprisonment for such terms of years as the court, in its discretion, shall determine, but before the death penalty may be imposed, that question must be submitted to the jury. As to whether it should be so submitted is a matter entirely in the discretion of the trial court. He may sentence to imprisonment in his discretion, or he may, in his discretion, submit to the jury for its recommendation on the question of the death penalty. We conclude the court properly submitted to the jury the question calling for its recommendation as to the death penalty.

Complaint is made with reference to the introduction in evidence of a photograph of the inside of the dugout at Spooner, Wisconsin, taken at the time the defendant led his captors to the spot, and depicting the dead bodies of Ross and Gray. It is said this was calculated to have an inflammatory effect on the minds of the jury. We think this photograph should not have been admitted as it neither proved nor tended to prove any issue submitted to the jury. We do not see, however, how it could have had the prejudicial effect claimed. Certainly, the photograph did not portray the defendant as a "heartless, cruel and savage person" to any greater extent or in any manner more convincing than the details of the crime as related by him, both in his confession after his arrest and his testimony as a witness at the trial.

It is said the court erred in compelling the defendant to remain manacled to deputy marshals during the trial, which had its prejudicial effect. This was a matter within the discretion of the trial court, not subject to review, unless that discretion was abused. We find no abuse in this respect.

It is also argued that the court erred in its refusal to charge the jury to the effect that it could not recommend a death sentence in case (1) the death of Ross was not the result of intentional injury inflicted

upon him by the kidnapers, but the result of an accidental fall; (2) that Ross was voluntarily accompanying the kidnapers back toward Chicago at the time of his death; (3) that Ross was no longer in the custody of the kidnapers at the time of his death. Considering defendant's testimony in the light most favorable to him, there was no justification for such charge and the request was properly refused.

Counsel for both the Government and the defendant call attention to the extreme care exercised by the Trial Judge in his endeavor to give the defendant a fair and impartial trial. A careful study of the record convinces us that he succeeded in a manner quite satisfactory. At the very outset he appointed as counsel for the defendant, two able and outstanding members of this Bar, who have given of their services unstintingly. They have raised and forcibly presented, both in the Trial Court and here, every conceivable question bearing upon the defendant's right to a trial such as is provided by the law of the land. In our judgment, no one could hope, much less expect, that defendant, in another trial, either before the same or a different judge, would obtain a trial less free from error than that which he had, and we might add, could neither hope for nor expect a different result.

The judgment is affirmed. Since the day fixed for the execution of the judgment and sentence has passed, the action is remanded with directions that the trial court cause the defendant to be brought before it and that it then fix a day for the execution of the judgment and sentence.